592 N.E.2d 1264 (1992)
In re the Mental Commitment of W.W.
No. 67A04-9104-CV-97.
Court of Appeals of Indiana, Fifth District.
June 10, 1992.
*1265 Christopher V. Haile and Dawn L. Howell, Legal Services Organization of Indiana, Inc., Indianapolis, for appellant.
David E. Lawson, Howard, Lawson & Wood, Danville, for appellee.
SHARPNACK, Judge.
W.W. appeals the trial court's order committing her because she suffers from mental illness and is gravely disabled. We affirm.
W.W. presents two issues for review, which we combine and restate as whether there was sufficient evidence to support the court's finding that W.W. was mentally ill and gravely disabled.
The evidence most favorable to the court's decision reveals that on January 1, 1991, thirty-seven year-old[1] W.W. was hitchhiking along the interstate when a minister stopped and asked her if she needed a ride. Responding that she did, W.W. and the minister rode together as far as Greencastle, Indiana. Once in Greencastle, the minister stopped at a gas station and called the police.
Responding to the minister's call, the police delivered W.W. to a doctor at Putnam County Hospital. Upon seeing W.W.'s condition, the doctor requested that a mental health worker evaluate W.W. After the evaluation, W.W. was detained at Putnam County Hospital on an emergency basis and was transported later that evening to Methodist Hospital.
Once at Methodist Hospital, W.W. was examined by Dr. Debra Marshino. Determining that W.W. suffered from a psychiatric disorder and that she was gravely disabled, Dr. Marshino reported that W.W. was in need of custody, care or treatment in an appropriate facility, either Central State Hospital or Madison State Hospital. On January 7, the Putnam Circuit Court ordered W.W.'s continued pre-hearing detention and set a hearing date for January 10. Following the hearing, the court found that W.W. was suffering from a psychiatric disorder, that she was gravely disabled as a result of her disorder, and that she was unable to care for herself or receive treatment or care without court intervention. The court therefore ordered that W.W. be committed to Central State Hospital for a period of time to be determined by that institution.
We begin our analysis by stating that in order to support a commitment the petitioner must prove by clear and convincing evidence that the person in question is both:
1. mentally ill and
2. gravely disabled or dangerous.
I.C. § 16-14-9.1-3.
A person is "mentally ill" within contemplation of the statute if the person has
a psychiatric disorder that substantially disturbs an individual's thinking, feeling, or behavior and impairs the individual's ability to function. The term includes any mental retardation, alcoholism, or addiction to narcotics or dangerous drugs.
I.C. § 16-14-9.1-1(a).
A person is "gravely disabled" if the person has a condition
in which [the] individual, as a result of mental illness, is in danger of coming to harm because the individual:
(1) Is unable to provide for that individual's food, clothing, shelter, or other essential human needs; or
(2) Has a substantial impairment or an obvious deterioration of that individual's judgment, reasoning, or behavior *1266 that results in the individual's inability to function independently.
I.C. § 16-14-9.1-1(b).
We deal with the review of a case decided on a "clear and convincing" standard as we do with a case decided on a "beyond a reasonable doubt" standard. Miller Brewing Co. v. Best Beers of Bloomington, Inc. (1991), Ind. App., 579 N.E.2d 626. When we review the evidence supporting such a judgment, we may neither reweigh the evidence nor judge the credibility of the witnesses. Washington v. State (1982), Ind., 441 N.E.2d 1355, 1358. Where the evidence is in conflict, we are bound to view only that evidence which is most favorable to the judgment of the trial court. Id. If there is any substantial evidence supporting the judgment, we must affirm. Hutchinson v. State (1985), Ind., 477 N.E.2d 850.
A review of the evidence reveals that there is sufficient evidence to support the trial court's judgment that W.W. is both mentally ill and gravely disabled. Dr. Marshino testified that W.W. suffers from bipolar disorder, which is an illness characterized by two primary features. The first primary feature consists of potentially rapidly shifting mood disorders ranging from overly friendly or euphoric to irritable and easily agitated. The second primary feature consists of mood disturbances so severe that a person suffering from the illness has difficulty functioning in either employment or interpersonal relationships.
During her stay in the hospital, W.W. has most frequently exhibited irritable and easily agitated mood disorders along with impaired relationships. For example, W.W. was at times threatening with, and threw things at, the hospital staff, and she ended most of her discussions with Dr. Marshino by screaming at the doctor and leaving the room by slamming the door.[2] Other features of the illness that W.W. exhibited during her hospital stay included pressured speech, flight of ideas, an inability to clearly construct thought processing, and distracted thinking so severe at times that communication with W.W. was difficult.
Dr. Marshino's recommended treatment plan for W.W. included continued hospitalization until W.W.'s symptoms stabilized and treatment with medication, with the drug of first choice being lithium. Dr. Marshino testified that she expected to see W.W. calming somewhat after being maintained in a structured environment for a period of time but that, absent treatment with medication, no major improvements, no improved functioning, and no resolution of W.W.'s symptoms could be expected.
At her hearing, W.W. testified on her own behalf. During direct examination, W.W. stated the following:
A. Well I went to, from Pennsylvania I went to Ohio and then I, I just walked into the State of Indiana, just touched the State of Indiana and they brought me here.
Q. I'd like to ask you about that, you were just walking ...,
A. Umhmm.
Q. uh, and hitchhiking, is that right?
A. Well some man stopped ...,
Q. stopped ...,
A. I did not ask him for a ride. This man was in the car and he stopped his car and asked me if I needed a ride. I said yes so he, he drove me as far as, uh, this is Greencastle?
Q. Right.
A. To Greencastle and walked into a gas station, and, and, I mean pulled up into a gas ..., say he was going to go into the gas station, get gas, and I told him I would wait right there. I was not in the driver's seat. The man had the keys in his hand, he walked into the gas station, he took so long that I went in *1267 there to find out what took him so long. And I suspect that if I hadn't of walked in that gas station at that specific time before the police officer arrived there, at that gas station, that man might have tried to have said I stole the, his vehicle.
* * * * * *
Q. But you have, have you been in some mental hospitals and had had some psychiatric treatment in the past?
A. No, besides the mental hospital, the Federal Mental Hospital in Washington D.C. which released me, I was also in the State Hospital in Summerset [Somerset?], Pennsylvania, and they sent me by bus, uh, and I, I left there. Also last year I was in the State Hospital here in Indiana, in Madison, Indiana. There is a judge by the name of Judge Todd who was over the proceedings, and he released me from the State Hospital here in Indiana. And the judge stood right in front of me and he, he, he told me right to my face, he said he would prefer if I left by bus, but he said that he was leaving it up to me, he said if I wanted to, he said there was the door, he said I could just walk out the door. And I sided with the judge, I, I was using common sense and I said yes I think you're right, I think I should leave by bus.
Q. Okay.
A. And the, I was transported by car from the State Hospital in Madison, Indiana, uh, and taken to the bus station and they purchased a ticket, a check . .., a ticket was wrote out, and I left by bus from Madison, Indiana last year. Because of the Judge Todd, and I had an attorney by the name of Walro, W-a-l-r-o,. And he, there must be some kind of record, either the, uh, some kind of check was written when the, when the bus ticket was purchased, or either my attorney has a record or else the, the judge himself. There has to be some kind of, of, uh, record. I know for a fact though that the hospital does not actually come out and admit these things. They, they try to keep a person in a mental hospital, not because they're mentally ill, just because they get paid for that.
Q. Okay [W.W.], and if ...,
A. And they shouldn't get paid for keeping people in the mental hospital that are not mental.
Q. Is it true as Doctor Marshino testified that you had discussed with her, you do work, you have worked alot [sic] in the past?
A. Yes.
Q. Uh, and, and do you travel around and work at different motels and lodges across the country and provide for yourself?
A. Yes I, I even went to Canada, uh, several years ago. I, I went up there and I found a job in a restaurant, working around food. And I, I wear a medic alert bracelet, I don't take any drugs at all. I don't believe in it. I believe in the least drugs that a person can take, even asprin [sic], their body is far better off. And I, I did work in Canada like I said, and uh, there was a problem though because up on Canada they require a work permit for people that aren't Canadian citizens. And I was not a Canadian citizen so my boss, she was the manager at the restaurant, invited me to her house in Canada, and I, I went to her house and she said I could stay there until I decided whether to stay up in Canada or come back down to the States. And I was at her house and then I told her well I might as well come back down to the States, so I left and that's exactly what I did.
Q. And if the Judge were to release you, uh, where will you go and with whom will you stay?
A. Uh, back to Ohio. And I, I have a friend there, who, he has a job, he has a job himself. And I stayed with him for awhile until I got a job, and uh, he still lives in Ohio, so I'm, I'm sure that it will be fine, because I've stayed with him before.
Q. But, uh, you were pretty irritated when they confined you in the hospital, but (unintelligible) .. .,
A. Well the, the problem was the, the interruption that, or the question that I asked when I was sitting over there by *1268 you, was uh, I was going to ask the doctor straight out if they perform such tests as not, as keeping people from making phone calls. That is what they did. Uh, they kept me from making phone calls. I had a Ten Dollar bill. I asked them to go get change for me. They kept my Ten Dollar bill and said I couldn't make any phone calls and put me in a secluded room.
Q. That's why you were irritated, is that right?
A. Yes. And I told them I needed to make phone calls, call an attorney, to, to try to get out of there, to, to even call this, this judge, the judge, Judge Todd down in Madison, Indiana, to see if he can, uh, somehow send records or verify that I had been released from Madison State Hospital.
Q. Okay, I'll just ask you, you knew enough about your situation that you were trying to do what you could do by, to get ...,
A. Right.
Q. your records and try to make some contacts, is that right?
A. That's right, that's all I, I wanted ...,
Q. Is that what irritated you more than anything that you couldn't do that?
A. Well there was another instance. One of the workers after, my, I was admitted into the hospital and my, my property was brought into the hospital, I had earrings and I had some, some little bells, and some, some of those Christmas ..., they almost look like Christmas decorations but they were earrings. I also had a, had a pair of earrings and they were round ball like, and I had bought them at a K-Mart store, and I had the, the, the piece of paper, it was a little pamphlet that came with these earrings because they were suppose to be non-allergenic. And I have allegies [sic], that's why I wear a medic alert bracelet. So these earrings, uh, I had bought, I had purchased at, at K-Mart, and one of the workers at the hospital stole them, and wore them in front of me. I, I think the reason, and the only reason she took them was to irritate me. To wear them in front of me and dare me to do something to her. They had drugs at their disposal. They, they could lock me up in a, in a room, and there they were putting on my, a worker was putting on my earrings and daring me to do something to her.
Q. Okay ...,
A. And, and that's one reason I, I got upset, because I told them she had my earrings on, and they were not doing anything about it. She stole my earrings.
Q. That's the reason you were upset ...,
A. And her name was Rita. The worker that, that took the earrings, and then they went ahead and, and refused me phone calls, and refused to give me my money to, to make phone calls. That's what they did.
(Record, pp. 62-7.)
During Dr. Marshino's cross-examination, W.W. interjected the following unsolicited comments:
Q. And then you said that you initially examined the respondent for forty-five minutes, is that right?
A. That's right.
Q. And then later, I think you said the Third, Fourth, Sixth, Seventh, Eighth and Ninth, you visited for from five to fifteen minutes?
A. That's right.
Q. And based on this about sixty-five minute examination over a period of about a week you've testified in here today you recommend commitment of the person, is that right?
A. That's right.
W.W.: I'm thirty-seven, not thirty.
A. Let me say that I, I would certainly have wanted to continue to examine the patient, but she simply would not permit it on most occasions.
Q. Doctor Marshino ...,
W.W.: I'm not a ward of the State.

*1269 Q. Doctor Marshino, I'd just like to ask your opinion...,
(Record, p. 57-8.)
We set out this testimony at some length to illustrate, as best a transcript can, the thought processes of W.W. as demonstrated by her testimony. The trial court, by listening to this testimony and by observing W.W. as she testified, could reasonably have concluded that W.W. was exhibiting both an inability to clearly construct her thought processing and distracted thinking. Such conclusions would have corroborated Dr. Marshino's observations and conclusions about W.W.
In rendering its judgment, the trial court found that W.W. was suffering from a psychiatric disorder, that she was gravely disabled as a result of her condition, and that she was unable to care for herself or receive treatment or care without the intervention of a court order. Although Dr. Marshino did not employ the statutory language "gravely disabled," it was for the court to conclude whether or not the statutory criteria existed. "Gravely disabled" in this case means that W.W. suffers a condition in which she is in danger of coming to harm, as a result of her mental illness, because she "has a substantial impairment or an obvious deterioration of [her] judgment, reasoning, or behavior that results in [her] inability to function independently." I.C. § 16-14-9.1-1(b)(2). By applying this definition to the aforementioned evidence, and by applying a standard of review prohibiting us both from reweighing the evidence and judging the credibility of the witnesses, we hold that there is substantial evidence to support the trial court's findings and subsequent order, and we affirm.
AFFIRMED.
CHEZEM, J., concurs.
MILLER, J., dissents with opinion.
MILLER, Judge, dissenting.
The majority is attempting  hopefully unsuccessfully  to overturn the Supreme Court's decision in Addington v. Texas (1979), 441 U.S. 418, 99 S.Ct. 1804, 60 L.Ed.2d 323, which held that before a fellow citizen can be deprived of her freedom and confined to a mental institution for treatment, there must be clear and convincing evidence by an expert psychologist or psychiatrist to support the confinement. Here, while the psychiatrist established the statutory requirement of mental illness, she failed to establish W.W.'s inability to function independently. She only established that W.W. had difficulty in functioning because of her mental illness.[1] Further, the majority attempts to bolster, contrary to Addington, the psychiatrist's unclear and unconvincing testimony by suggesting the trial judge was capable of diagnosing W.W.'s illness merely by observing her testimony at trial.
The statute defines a person as mentally ill when the psychiatric disorder disturbs the person's thinking, feeling or behavior, and impairs the person's ability to function. In other words, when mental illness is established, it is also established that the person has an impairment and consequent problems  in this case, difficulty in functioning. The majority's opinion result holds that anyone with a mental illness may be confined against his or her will because their thinking or behavior is impaired. That is not the law. There is a second significant element which must be established; that is, not only is the patient impaired, but the impairment must cause more than difficulty in functioning  it must cause inability to function. There is no evidence that W.W.  who wore a medic alert bracelet as a health precaution  was malnourished or that she had failed to care for herself. The following testimony by Dr. Marshino about W.W.'s condition indicates, at best, only difficulty in functioning:
Q. Would you state your name and your profession?
A. Debra Marshino, I'm a psychiatrist.
Q. Where are you currently employed?

*1270 A. I'm employed at Cummins Mental Health Center.
Q. And would you briefly state your educational background?
A. I was educated at Indiana University, both as an undergraduate and to get my medical degree. I attended the psychiatric residency at Indiana University Medical Center as well.
Q. What specialties do you have?
A. Psychiatry is my specialty.
Q. Are you board certified or eligible.
A. I'm board eligible.
Q. Do you know the respondent [W.W.]?
A. Yes I do.
Q. What is her age?
A. She's thirty.
Q. And when was she admitted to the hospital?
A. She was admitted on the first day of January, Nineteen Ninety-one.
Q. And to what hospital was that?
A. Methodist Hospital.
Q. What were the circumstances surrounding her admission?
A. She was brought into the emergency room at Putnam County Hospital, and that was on the First day of January. She was noted in the emergency room to become agitated and loud. She had been brought in due to the fact that she had been hitchhiking on the interstate. She was brought in by a minister initially who delivered her to the police, and the doctor, and they upon seeing her condition requested that a mental health worker evaluate her. And so that was done, the crisis worker saw her and felt that she was mentally ill, so she was detained and sent to Methodist Hospital.
Q. Have you had an opportunity to examine the respondent?
A. Yes I have.
Q. Would you state the frequency and duration of the examinations?
A. I first saw [W.W] on the Second day of January. I saw her at that time for approximately forty-five minutes. I saw her on the Third, the Fourth, the Sixth, the Seventh, the Eighth, and the Ninth as well. The subsequent visits lasted from five to fifteen minutes.
Q. As a result of your examinations have you been able to arrive at a clinical diagnosis?
A. Yes I have.
Q. And would you state that clinical diagnosis please?
A. Bipolar disorder, and [W.W.] has been in (inaudible) phase of the disorder.
Q. Describe the behavior you observed during your examinations that confirm this diagnosis and explain the nature of the illness as it relates to the observed behaviors, please?
A. The illness is primarily a disorder of mood, and the mood can be rapidly shifting, it's usually, overly friendly or euphoric, which I have rarely seen in [W.W.]. It can also be irritable and easily agitated. And that's what I've seen most frequently in [W.W.]. That's what was noted in the emergency room and was felt to be of concern. The other primary feature of the disorder is that the mood disturbance is so severe that it makes it difficult for the person to function, either in employment or in an interpersonal relationships. I have seen the impairment in relationships in that [W.W.'s] been very easily angered and easily irritated while in the hospital and has at times been threatening with, with staff people. The other features of the disorder that have been prominent in [W.W.] are pressured speech, flight of ideas, some (unintelligible) ideas, distractibility in her thinking, which is sometimes so severe that she is very confusing to listen to, making communication difficult. Those are the main features that I have observed.
Q. Do you know whether the respondent has been treated for a mental illness or do you know her history?
A. I have obtained only bits of her history. She in speaking with me has made reference to being in mental institutions in Pennsylvania and Washington D.C. and at Madison State Hospital here in Indiana. I don't know details of any of *1271 these hospitalizations. There may be others, I haven't really been able to obtain a complete history. Most of the times that I saw [W.W.] she would end our discussions quickly becoming very angry, beginning to scream at me and eventually slammed the door in, in leaving. Its not been possible for other members of the staff to obtain a history either because she has really been behaving similarly or, or with more agitation. She's never actually threatened me or thrown anything at me, but she has with other staff members, and so we've really been unable to discern a lot of her background. The picture that I have from speaking with her is she has travelled widely, she talks about being in Pennsylvania over Christmas. She worked in Ohio and I do, I do have evidence that she worked in Ohio in Nineteen Eighty-nine, because she showed me some paystubs. She wouldn't give me any other clear employment history, stating what difference does it make. She did refer to being on welfare in the past. She talked about being in Canada, in Oklahoma, so it sounds as though she had been, you know, at many cities around the country.
Q. If you were going to treat this patient with this described mental illness, what would be your recommended treatment plan?
A. My recommendation would be for the patient to remain hospitalized until she had some stabilization of her symptoms. I would recommend treatment with medication, and the drug of first choice would be lithium. I do expect and, and we do begin to see some calming of the patient, after being maintained in a structured environment for a period of time. On the other hand, we haven't seen any resolution of her symptoms and wouldn't really expect any major improvements unless we were permitted to treat with medication.
Q. What in your opinion is the least restrictive environment suit ..., suitable for the necessary care, protection and treatment for this respondent?
A. I would recommend Central State Hospital. I ...,
Q. What is your ..., okay, what is your ...,
A. One of the reasons for that recommendation is that if she were transferred to Central State Hospital, they have a program where they're able to contact other states, and if [W.W.] has some relatives, family, some connections or support system in another state that we're not aware of, they may, may be able to ascertain that, and they may be able to get her treatment closer to home if she has one.
Q. What is your prognosis?
A. I think she could be much improved in terms of her level of, of functioning with treatment. Bipolar disordered patients really show a marked improvement and many of them are able to function very well both interpersonally and occupationally.
(Emphasis added) (R. 52-57). The following was revealed on cross-examination of Dr. Marshino:
Q. Doctor Marshino you said that you were eligible to take the psychiatric boards, is that right?
A. That's right.
Q. Is that, I don't know much about it, is this kind of like finishing law school and then being ready to take the bar exam or something where you're finally officially a psychiatrist.
A. It's a similar situation.
Q. And then you said that you initially examined the respondent for forty-five minutes, is that right?
A. That's right.
Q. And then later, I think you said the Third, Fourth, Sixth, Seventh, Eighth and Ninth, you visited for from five to fifteen minutes?
A. That's right.
Q. And based on this about sixty-five minute examination over a period of about a week you've testified in here today you recommend commitment of the person, is that right?
A. That's right.
[W.W.] I'm thirty-seven, not thirty.

*1272 A. Let me say that I would certainly have wanted to continue to examine the patient, but she simply would not permit it on most occasions.
Q. Dr. Marshino ...,
[W.W.] I'm not a ward of the State.
Q. Doctor Marshino, I'd just like to ask your opinion...,
A. Okay.
Q. Since you gave your opinion on her psychiatric condition, if you could imagine what it would be like, you told some of the facts that she was picked up while she was hitchhiking, you talked about some of the jobs she's had across the country, we might assume I think she was going to another job, or leaving one job going to another, what it would be like to be going about your business from one job to the next one, I want to ask about a person's emotional state if this happened to, and the next thing they knew they were detained by the police when they were going about their business to their employment, then the next thing they knew they were being committed at a hospital under psychiatric care, could this effect, some of the things you testified about, about irritable, agitated, threatening, distracted, could these physical events, and I'll repeat them, going about your own business to a job, being taken into the care of a policeman, being transported to a mental hospital under locked doors, could that lead to these symptoms that you described?
A. I would say that its possible that a certain degree of some of those symptoms would be present, but not to the extent seen with [W.W.]. I would also like to add that I have seem in [W.W.] an inability to construct her thought processing clearly, which is what we call a flight of ideas, and also an overly suspicious concern ...,
Q. I'd like to ask you another question on that idea...,
A. that makes me think that she is suffering from a mental illness as opposed to just responding to a set...,
* * * * * *
A. of circumstances.
* * * * * *
Q. How many patients have you treated with similar circumstances, have been traveling, minding their own business, have been picked up, taken to the police and been transported to a mental hospital, so you would know from your expertise how these particular moods of irritability, agitation, would be effected?
A. I can't really give you a number on that. Let me say that its certainly not uncommon in our treatment of patients, I work in a mental health center, we've detained quite a number, I saw a great number of similar cases in residency. People who were detained against their will.
* * * * * *
Q. But it wouldn't be unusual I think you indicated for someone to become agitated, to become irritable, to become somewhat threatening if they were taken from these circumstances of a peaceful nature traveling about their business and finding themselves confined in a mental institution, is that right?
A. As I said, I think a certain degree of that sort of thing would be appropriate, would be a usual response.
(R. 57-60).
Dr. Marshino's testimony simply fails to cut the mustard.[2] My conclusion is fully *1273 supported by the majority's opinion. In a typical commitment action on review, the psychiatrist's testimony is examined for sufficiency and, when such testimony establishes mental illness plus the individual's inability to function, we find the commitment to be justified. Here, the majority has briefly summarized the doctor's testimony which, in my opinion, addressed only the necessary mental illness element and then felt obligated to insert lengthy quotations of W.W.'s testimony which, by even a wild stretch of the imagination, would not and should not permit a layman, untrained in the mental illness field, to diagnose and prescribe treatment. Yet, this is what the majority holds in this case. After citing the lengthy testimony of W.W., the majority says, surprisingly:
"We set out this testimony at some length to illustrate, as best a transcript can, the thought processes of W.W. as demonstrated by her testimony. The trial court, by listening to this testimony and by observing W.W. as she testified, could reasonably have concluded that W.W. was exhibiting both an inability to clearly construct her thought processing and distracted thinking. Such conclusions would have corroborated Dr. Marshino's observations and conclusions about W.W."
Opinion at 1269 (emphasis added).
The underscored language clearly contravenes the Supreme Court's decision in Addington, supra, by holding that, although a psychiatrist's testimony does not establish mental illness and inability to function, yet an untrained layman  the trial judge  can diagnose the illness and prescribe treatment merely by hearing some rambling testimony of the patient.
In Commitment of J.B. v. Midtown Mental Health Center (1991), 581 N.E.2d 448, 452, this court found that the evidence was not clear and convincing that J.B., a thirty-one year old female who put herself at risk by jumping out of her mother's car into traffic, was not a danger to herself within the meaning of the statute. Mere pronouncements by the testifying doctor  that J.B.'s conduct constituted manifestations of her mental illness and those manifestations made her dangerous to herself  were not enough. Id. In dissenting, Judge Sharpnack stated "[w]hether or not particular behavior is a `result of mental illness' is not a factual determination that lay persons, albeit judges, are capable of making without benefit of medical testimony." Id. at 454 (Sharpnack, J., dissenting) (emphasis added). While I agree with the J.B. majority, I also agree with Judge Sharpnack's comment  trial judges are not permitted to confine people as mentally ill based on their own observations.[3] As stated by the Supreme Court in Addington:
"At one time or another every person exhibits some abnormal behavior which might be perceived by some as symptomatic of a mental or emotional disorder, but which is in fact within a range of conduct that is generally acceptable. Obviously, such behavior is no basis for compelled treatment and surely none for confinement. However, there is the possible risk that a factfinder might decide to commit an individual based solely on a few isolated instances of unusual conduct. Loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior."
Addington, supra, 99 S.Ct. at 1810.
The doctor's testimony did not establish, by clear and convincing evidence, the second statutory requirement for involuntary commitment on the basis of mental illness and grave disability  inability to function.
In summary, the doctor established clearly and convincingly that W.W. had a mental illness with impairment causing her difficulty in functioning. She also gave her opinion, the same as did the doctor in Commitment of J.B., that W.W. should be confined for treatment. However, the doctor did not establish by clear and convincing evidence that W.W. was an imminent danger to herself or others and thus was unable *1274 to function without being institutionalized for treatment.
I would reverse.
NOTES
[1] The record reveals some discrepancy concerning W.W.'s age. While Dr. Marshino testified that W.W. was thirty years old, W.W. stated that she was instead thirty-seven years old.
[2] Dr. Marshino also testified that while a certain degree of irritability, agitation, and distraction, accompanied by a threatening manner, might be expected from an individual in the same set of circumstances as W.W., these symptoms would not be present to the extent that she had seen them with W.W.

In addition, Dr. Marshino stated that, while she certainly wanted to continue to examine W.W., on most occasions W.W. simply would not permit it.
[1] Contrary to the majority's assertion, this is not simply a case in which the doctor failed to employ the exact statutory language.
[2] Dr. Marshino failed to testify to anything more than difficulty in functioning. However, Dr. Marshino had enough confidence in W.W.'s ability to communicate and function that the doctor relied solely upon W.W. for her medical history (physical and mental) and employment history.

Thus, absent from Dr. Marshino's testimony was any information relating to the physical condition or a physical examination of W.W. Also, absent from the doctor's testimony was any information confirming that W.W. had been institutionalized, and, if so, the diagnosis, treatment and reason for release. Dr. Marshino testified that she received both her bachelors and medical degrees from Indiana University. She had attended the psychiatric residency at Indiana University Medical Center, was now board eligible, but not yet board certified. She stated that her situation was similar to a law school graduate who had not yet passed the bar.
[3] However, in cases where more than one expert testifies, the trier of fact is in a position to choose which expert to believe if there is conflicting testimony.