# FOR PUBLICATION



ATTORNEY FOR APPELLANT:

**VALERIE K. BOOTS**
Marion County Public Defender
Indianapolis, Indiana

ATTORNEY FOR APPELLEE:

**TAMI R. NANTZ**
Staff Attorney
Office of Regional Counsel
U.S. Department of Veterans Affairs
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| IN THE MATTER OF THE COMMITMENT OF T.K., | ) | |
| | ) | |
| | ) | |
| T.K., | ) | |
| | ) | |
| Appellant-Respondent, | ) | |
| | ) | |
| vs. | ) | No. 49A05-1303-MH-100 |
| | ) | |
| DEPARTMENT OF VETERANS AFFAIRS, | ) | |
| | ) | |
| Appellee-Petitioner. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Barbara Collins, Senior Judge
Cause No. 49D08-9906-MH-582

**August 21, 2013**

**OPINION - FOR PUBLICATION**

**BRADFORD, Judge**

An application for the emergency detention of Appellant-Respondent T.K. was filed on February 8, 2013. The application alleged that T.K. was a mentally ill and dangerous person. That same day, the trial court issued an order granting the application. T.K. was admitted to the Richard L. Roudebush VA Medical Center ("the VA Medical Center") on or about February 11, 2013. Following a February 19, 2013 evidentiary hearing, the trial court issued an order of regular commitment, finding that T.K. was suffering from mental illness and was dangerous to others. On appeal, T.K. challenges the sufficiency of the evidence to sustain the trial court's order. We affirm.

**FACTS AND PROCEDURAL HISTORY**

During the week leading up to February 8, 2013, T.K. made over twenty-five threatening phone calls to Adult and Child Inc. ("Adult and Child").[1] In these threatening phone calls, T.K. threatened to "cut off the genitals of staff" and made threats to the director of the facility. Because of the large number and threatening nature of the calls, on February 8, 2013, Adult and Child filed an application for the emergency detention of T.K. The application indicated that staff at the facility noted that they found T.K. to be hostile, actively psychotic, delusional, and in need of immediate help. The trial court granted the application; issued a warrant for T.K.'s arrest; and issued an order allowing for T.K. to be detained, examined, and treated at the VA Medical Center.

T.K. was detained about three days later and admitted to the VA Medical Center.

---

[1] Adult and Child provides mental health and child welfare programs in Indianapolis and central Indiana. *See* http://adultandchild.com/ (last visited August 8, 2013).

While at the VA Medical Center, T.K. was treated by Dr. Corey Trobaugh. During the course of his treatment, T.K. threatened Dr. Trobaugh by telling Dr. Trobaugh that he could hurt him and take his money and clothes. T.K. also asked Dr. Trobaugh if he had children, and, when Dr. Trobaugh did not respond, T.K. told Dr. Trobaugh "well I can take them." Tr. p. 14. T.K. later told Dr. Trobaugh that he could "strap [Dr. Trobaugh] into a chair and taser [him]." Tr. p. 14. Dr. Trobaugh felt threatened by T.K.'s words and menacing demeanor.

T.K. also threatened the staff at the VA Medical Center, who considered T.K.'s behavior "as being largely hostile, aggressive, and threatening in nature." Tr. p. 14. T.K. threatened to make the VA "pay" if he were committed, stating that he would "have [a] behavioral outburst that would cost the VA millions of dollars." Tr. pp. 14, 15.

After meeting with T.K. on two separate occasions and reviewing T.K.'s medical history, which included a documented history of mental illness and prior mental illness-related commitments, Dr. Trobaugh diagnosed T.K. with chronic paranoid schizophrenia. In making this diagnosis, Dr. Trobaugh noted that T.K. exhibited disorganized speech, delusions of persecution, and grandiosity as well as paranoia. Dr. Trobaugh noted that T.K. did not show any insight into his mental illness, denied that he suffered from mental illness, and refused medication.

The trial court conducted an evidentiary hearing on February 19, 2013, for the purpose of determining whether a continued commitment of T.K. to the VA Medical Center was warranted. During the evidentiary hearing, Dr. Trobaugh acknowledged that T.K. had yet to act on any of the threats levied against anyone at Adult and Child or the VA Medical Center.

For his part, T.K. attempted to diminish the serious nature of his threats against Dr. Trobaugh by construing the threats as a "miscommunication." Tr. p. 17. Dr. Trobaugh testified that he believed that T.K. posed a danger to others and indicated that he believed that a regular commitment was necessary to ensure that T.K. received the necessary treatment and care. Upon the conclusion of the presentation of the evidence, the trial court determined that without treatment, T.K. was a danger to others. The trial court issued an order of regular commitment, which involuntarily committed T.K. to the care of the VA Medical Center for a term of at least ninety days. This appeal follows.

## DISCUSSION AND DECISION

### I. The Question of Mootness

T.K. concedes that he has been discharged from his involuntary commitment at the VA Medical Center for some time now. Therefore, this court cannot render effective relief to him. *See In re Commitment of J.B.*, 766 N.E.2d 795, 798 (Ind. Ct. App. 2002). "When a court is unable to render effective relief to a party, the case is deemed moot and usually dismissed." *Id*. (citing *In re Lawrance*, 579 N.E.2d 32, 37 (Ind. 1991)). However, although moot cases are usually dismissed, Indiana courts have long recognized that a case may be decided on its merits under an exception to the general rule when the case involves questions of "great public interest." *Id*. (citing *In re Lawrance*, 579 N.E.2d at 37). Typically, cases falling in the "great public interest" exception contain issues that are likely to recur. *Id*.

"The question of how persons subject to involuntary commitment are treated by our trial courts is one of great importance to society." *Id*. "Indiana statutory and case law affirm

4

that the value and dignity of the individual facing commitment or treatment is of great societal concern." *Id.* (citing *In re Mental Commitment of M.P.*, 510 N.E.2d 645, 646 (Ind. 1987) (noting that the statute granting a patient the right to refuse treatment "profoundly affirms the value and dignity of the individual and the commitment of this society to insuring humane treatment of those we confine")). The instant case involves the proof necessary for involuntary commitment. Because this is an issue of great public importance that is likely to recur, we will address it here. *See generally Commitment of S.T. v. Cmty. Hosp. N.*, 930 N.E.2d 684, 687 (Ind. Ct. App. 2010); *Commitment of M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 94 n.3 (Ind. Ct. App. 2005), *trans. denied*; *In re Commitment of J.B.*, 766 N.E.2d at 799.

## II. Sufficiency of the Evidence

T.K. contends that the evidence is insufficient to prove that an involuntary commitment at the VA Medical Center was warranted. Upon review, "we consider three factors to determine whether the totality of the circumstances support an involuntary commitment: the gravity of the behavior leading to hospital admission, behavior in the hospital, and the relationship between problematic behaviors and the person's mental illness." *Commitment of S.T.*, 930 N.E.2d at 690. In the instant matter, T.K. specifically argues that the evidence is insufficient to sustain the trial court's determination that he was dangerous. T.K. also argues that the evidence is insufficient to sustain the trial court's determination that a regular commitment order reflected the least restrictive environment suitable for his treatment.

## A. Standard of Review

Proceedings for involuntary commitment are subject to federal due process requirements. For the ordinary citizen, commitment to a mental hospital produces "a massive curtailment of liberty" and thus "requires due process protection." *Addington v. Texas*, 441 U.S. 418, 425, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979); *see also C.J. v. Health and Hosp. Corp. of Marion County*, 842 N.E.2d 407 (Ind. Ct. App. 2006). The loss of liberty produced by an involuntary commitment is more than a loss of freedom resulting from the confinement. Commitment to a mental hospital "can engender adverse social consequences to the individual; ... [w]hether we label this phenomena stigma or choose to call it something else ... we recognize that it can occur and that it can have a very significant impact on the individual." *Addington*, 441 U.S. at 425, 99 S.Ct. 1804.

*Commitment of S.T.*, 930 N.E.2d at 687.

Our court has previously recognized that the extraordinary curtailment of liberty involved with a commitment to a mental hospital. *See Commitment of M.M.*, 826 N.E.2d at 97 (citing *Commitment of Gerke*, 696 N.E.2d 416 (Ind. Ct. App. 1998)). "Because everyone exhibits some abnormal conduct at one time or another, loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior." *Id*. "'There is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom.'" *Id*. (quoting *Commitment of J.B. v. Midtown Mental Health Center*, 581 N.E.2d 448, 451 (Ind. Ct. App. 1991), *trans. denied*).

When reviewing a challenge to sufficiency of the evidence with respect to commitment proceedings, we look to the evidence most favorable to the trial court's decision and draw all reasonable inferences from that decision. *In re the Commitment of G.M.*, 743 N.E.2d 1148, 1150-51 (Ind. Ct. App. 2001). Moreover, if the trial court's commitment order represents a conclusion that a reasonable person could have drawn, we will affirm the order even if other reasonable conclusions are possible. *Id*.

When we review the evidence supporting such a judgment, we may neither reweigh the evidence nor judge the credibility of the witnesses. *In re*

6

> *Mental Commitment of W.W.*, 592 N.E.2d 1264, 1266 (Ind. Ct. App. 1992).
> Where the evidence is in conflict, we are bound to view only that evidence that
> is most favorable to the trial court's judgment. *Id.*
>
> In commitment proceedings, the burden falls on petitioner to prove by
> clear and convincing evidence that: "(1) the individual is mentally ill and either
> dangerous or gravely disabled; and (2) detention or commitment of that
> individual is appropriate." Ind. Code § 12-26-2-5(e).

*Golub v. Giles*, 814 N.E.2d 1034, 1038 (Ind. Ct. App. 2004), *trans. denied*.

## B.  Whether the Evidence is Sufficient to Sustain the Trial Court's Determination that T.K. Was Dangerous

T.K. argues that the evidence presented during the evidentiary hearing is insufficient to sustain the trial court's finding that he was dangerous at the time of the commitment hearing.  T.K. acknowledges that the evidence indicates that he made "rather colorful verbal threats."  Appellant's Br. p. 8. T.K. asserts, however, that there was no evidence that T.K. "has ever followed through with any assaultive, violent or dangerous behavior."  Appellant's Br. p. 8.  As such, T.K. argues that this type of behavior does not suggest any risk, let alone a substantial risk, that he would harm himself or others.

> "Dangerousness" for our purposes is defined as "a condition in which
> an individual as a result of mental illness, presents a substantial risk that the
> individual will harm the individual or others." I.C. § 12-7-2-53 (West 2001).
> "Dangerousness must be shown by clear and convincing evidence indicating
> that the behavior used as an index of a person's dangerousness would not
> occur but for the person's mental illness." *Commitment of C.A. v. Center for
> Mental Health*, 776 N.E.2d 1216, 1218 (Ind. Ct. App. 2002).

*Commitment of M.M.*, 826 N.E.2d at 97.  "The determination of dangerousness under the involuntary commitment statute has always been a question of fact for the trial court to decide." *Commitment of S.T.*, 930 N.E.2d at 689.  Moreover, a trial court is not required to wait until an individual commits a physical act before determining that the individual poses a

7

substantial risk of harm to others. *M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 638 (Ind. Ct. App. 2005) (citing *Matter of Commitment of Gerke,* 696 N.E.2d at 421), *trans. denied*.

In the instant matter, the evidence demonstrates that in the week leading up to February 8, 2013, when Adult and Child filed its application for the emergency detention of T.K., T.K. made over twenty-five threatening phone calls to Adult and Child. In these threatening phone calls, T.K. threatened to "cut off the genitals of staff" and made threats to the director of the facility. Staff at the facility indicated that they found T.K. to be hostile, actively psychotic, delusional, and in need of immediate help.

With respect to his interactions with T.K. following his admission to the VA Medical Center, Dr. Trobaugh testified that T.K. threatened him. Specifically, Dr. Trobaugh stated that

> [T.K.] informed me that he could hurt me, that he could take my money, that he could take my clothes. He asked me if I had children, which I did not respond. He said, well I can take them. He later told me that he can strap me into a chair and taser me.

Tr. p. 14. Dr. Trobaugh testified that he felt threatened by T.K.'s words and menacing demeanor. For his part, T.K. attempted to diminish the serious nature of these threats and construe the threats against Dr. Trobaugh as a "miscommunication." Tr. p. 17.

Dr. Trobaugh further testified that T.K.'s behavior had been interpreted by the staff at the VA Medical Center "as being largely hostile, aggressive, and threatening in nature." Tr. p. 14. T.K. also threatened to make the VA "pay" if he were committed, stating that he would "have [a] behavioral outburst that would cost the VA millions of dollars". Tr. pp. 14,

8

15. Dr. Trobaugh did acknowledge that T.K. had yet to follow through on any of the threats levied against anyone at Adult and Child or the VA Medical Center.

In addition, Dr. Trobaugh diagnosed T.K. with chronic paranoid schizophrenia. T.K. exhibited disorganized speech, delusions of persecution, and grandiosity as well as paranoia. Dr. Trobaugh stated that he had reviewed T.K.'s medical records, which indicated that T.K. had been treated for mental illness in the past and had previously been subject to commitment for treatment for his mental illness. T.K. did not show any insight into his mental illness, denied that he suffered from mental illness, and refused medication. Dr. Trobaugh testified that he believed that T.K. posed a danger to others and indicated that he believed that a regular commitment was necessary to ensure that T.K. receives the necessary treatment and care. Upon review, we conclude that T.K.'s numerous threats to the therapists and staff at Adult and Child, T.K.'s continued threats to Dr. Trogaugh and the staff at the VA Medical Center, T.K.'s diagnosis as suffering from chronic paranoid schizophrenia, T.K.'s medical history that indicates that T.K. has suffered from mental illness for some time, as well as his denial that he suffers from mental illness and refusal to take recommended medication support the trial court's determination that, without treatment, T.K. was a danger to others.

Further, despite T.K.'s claim to the contrary, relevant Indiana precedent indicates that the trial court did not have to wait until T.K. acted on any of the threats levied against the staff at Adult and Child, Dr. Trobaugh, or the staff at the VA Medical Center before finding him to be dangerous. *See M.Z.*, 829 N.E.2d at 368; *see generally also Commitment of S.T.*, 930 N.E.2d at 691-92 (providing that evidence demonstrating that S.T. displayed extreme

anger; made, but did not carry out, threats; had to be secluded from other patients due to destructive verbal behavior; and admitted to irritability, mood swings, racing thoughts, poor anger management, erratic sleep, and increased risk-taking behaviors was sufficient to sustain the trial court's determination that S.T. was "dangerous"); *Jones v. State*, 477 N.E.2d 353, 360 (Ind. Ct. App. 1985) (providing that the evidence demonstrating that Jones exhibited character disorders of possibly sociopathic dimensions and was verbally assaultive and physically threatening to a degree she was sequestered from other patients was sufficient to sustain the trial court's determination that Jones was "dangerous").

Furthermore, to the extent that T.K. bases his claim regarding the sufficiency of the evidence upon this court's opinion in *In re Commitment of Steinberg*, 821 N.E.2d 385 (Ind. Ct. App. 2004), we find *Steinberg* to be distinguishable from the instant matter. In *Steinberg*, the trial court relied upon the testimony of Steinburg's mother that she was concerned that he would "mentally just [go] away" on his trips to Bloomington, despite the fact that no evidence was presented that this had indeed happened or was likely to happen. 821 N.E.2d at 388 (brackets in original). This court reversed the trial court's determination that Steinburg was dangerous, concluding that the trial court's determination was "purely speculative" and that the trial court should not have considered Steinburg's mother's unfounded concern that Steinburg might "mentally just go away" as proof of dangerousness. *Id*.

However, unlike in *Steinberg*, the above-stated evidence demonstrates that the trial court's determination that T.K. was dangerous was not based to mere speculation. The trial court's determination was based on actual threats levied by T.K. against the staff at Adult and

10

Child, Dr. Trobaugh, and the staff at the VA Medical Center. T.K.'s claim effectively amounts to an invitation to reweigh the evidence, which we will not do. *See Golub*, 814 N.E.2d at 1038.

### C. Whether the Evidence is Sufficient to Sustain the Trial Court's Determination that a Regular Commitment Was the Least Restrictive Environment Suitable for T.K.'s Treatment

T.K. also argues that the evidence presented during the evidentiary hearing is insufficient to sustain the trial court's finding that a regular commitment which placed T.K. in the care of the VA Medical Center for a period of at least ninety days was the least restrictive environment suitable for his treatment.

> In general, there are three types of commitments. An emergency detention limits the detention of an individual to seventy-two hours. Ind. Code §§ 12-26-5-1 to -12. A temporary commitment may be authorized for up to ninety days. Ind. Code §§ 12-26-6-1 to -11. "A regular commitment is the most restrictive form of involuntary treatment and is proper for an individual whose commitment is expected to exceed ninety days." *In re Commitment of R.L.*, 666 N.E.2d 929, 930 n. 3 (Ind. Ct. App. 1996); Ind. Code §§ 12-26-7-1 to -5.

*J.S. v. Ctr. for Behavioral Health*, 846 N.E.2d 1106, 1111 (Ind. Ct. App. 2006).

"If an individual has previously been the subject of a commitment proceeding, the court may order a regular commitment if a longer period of treatment is warranted." Ind. Code § 12-26-5-11(d). Indiana Code section 12-26-7-4 provides that a trial court shall conduct an evidentiary hearing upon receiving a report that recommends treatment in a facility for more than ninety days.

> If at the completion of the hearing and the consideration of the record an individual is found to be mentally ill and either dangerous or gravely disabled, the court may enter either of the following orders:
> (1) For the individual's custody, care, or treatment, or continued custody, care,

11

or treatment in an appropriate facility.

(2) For the individual to enter an outpatient therapy program....

Ind. Code § 12-26-7-5.

During the evidentiary hearing, Dr. Trobaugh requested the trial court to order a regular commitment. In making this request, Dr. Trobaugh testified that he believed a regular commitment was necessary because T.K. had been subject to numerous prior mental health commitments, his condition had again deteriorated to the point that commitment was necessary, T.K. refused to admit that he suffers from mental illness or take medication as instructed, and without treatment, T.K. was a danger to others. Dr. Trobaugh testified that he believed that T.K. needed to be committed to the VA Medical Center until his condition stabilized. Dr. Trobaugh further testified that T.K. would require outpatient treatment once his condition stabilized to a point where inpatient treatment was no longer necessary.

T.K.'s medical history and past involuntary commitments suggest that T.K. required ongoing outpatient treatment to maintain his mental health once his condition stabilized. Indiana Code section 12-26-14-7 provides that if an individual

> (1) has been committed under [Indiana Code § 12-26-7];
> (2) is likely to benefit from a therapy programed designed to decrease the individual's dangerousness or grave disability;
> (3) is not likely to be either dangerous or gravely disabled if the individual continues to follow the therapy program; and
> (4) is recommended for an outpatient therapy program by the individual's attending or examining physician;
>
> The superintendent of the facility in which the individual is committed or the court at the time of commitment may place the individual on outpatient status for the remainder of his commitment period, subject to the conditions of outpatient therapy programs....

In light of Dr. Trobaugh's testimony regarding T.K.'s need for inpatient treatment followed

12

by outpatient treatment and the clear language of Indiana Code section 12-26-14-7, we conclude that the evidence is sufficient to support the trial court's decision that a regular commitment offered the least restrictive alternative to ensure that T.K. received the needed long-term inpatient and outpatient treatment.

Furthermore, T.K. also appears to challenge the portion of the trial court's order that ordered him to take all medications as prescribed. In *In re Mental Commitment of M.P.*, 510 N.E.2d 645, 647 (Ind. 1987), the Indiana Supreme Court held that in order to override a patient's right to refuse treatment,

> the State must demonstrate by clear and convincing evidence that: 1) a current and individual medical assessment of the patient's condition has been made; 2) that it resulted in the honest belief of the psychiatrist that the medications will be of substantial benefit in treating the condition suffered, and not just in controlling the behavior of the individual; 3) and that the probable benefits from the proposed treatment outweigh the risk of harm to, and personal concerns of, the patient.

Dr. Trobaugh's testimony met these requirements.

Dr. Trobaugh testified that he had personally examined T.K. twice and had spent approximately six hours reviewing his medical records. Dr. Trobaugh's testimony made it clear that he considered the possible side effects in coming to the opinion that T.K.'s condition required treatment with medication. Specifically, Dr. Trobaugh stated that

> [s]ide effects are always a concern with any medication and we always weigh the risk against the benefits. And, if we were to have [T.K.] on a medication where the side effects were deemed intolerable, we would likely try to change it to a different medication.

Tr. p. 19. Upon questioning by T.K. about why medication was necessary and what T.K. would "get" from possible changes in medication, Dr. Trobaugh further stated that

13

[T.K.], I have a firm belief that the Haldol Decanoate injection showed some benefit in the past based on review of your medical records, and the interaction that you were having with staff. I think that more or less the issue that we're discussing has a possibility of side effects which I think the benefits of having you on the medication currently outweigh the risk of any current side effects, and I think that we would be perfectly happy, and willing to work with you to find the medication with the lease amount of side effects that still gave us the results that we need, so that you can live an appropriate life, and have the things that you wish to have.

Tr. p. 20. Dr. Trobaugh's testimony indicates that he wished to treat T.K.'s medical condition in the least restrictive way possible so as to provide T.K. with the opportunity to live a life unencumbered by mental illness.

In sum, concluding that the evidence is sufficient to sustain the trial court's determination that, without treatment, T.K. posed a danger to others as well as the determination that the ordered regular commitment offered the least restrictive alternative to ensure that T.K. received the needed long-term inpatient and outpatient treatment, we affirm the judgment of the trial court.

The judgment of the trial court is affirmed.

BAILEY, J., and MAY, J., concur.

14