## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jun 26 2020, 8:51 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Katelyn Bacon
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Bryan H. Babb
Sarah T. Parks
Bose McKinney & Evans, LLP
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Civil Commitment of C.C.,

*Appellant-Respondent,*

v.

Health and Hospital Corporation d/b/a Eskenazi Health Midtown Community Health,

*Appellee-Petitioner.*

June 26, 2020

Court of Appeals Case No. 19A-MH-2820

Appeal from the Marion Superior Court

The Honorable Melanie Kendrick, Judge Pro Tempore

Trial Court Cause No. 49D08-1910-MH-44738

**Pyle, Judge.**

# Statement of the Case

C.C. ("C.C.") appeals the trial court's order for his involuntary temporary commitment.[1] C.C. argues that there was insufficient evidence to support his temporary commitment because Eskenazi Health Midtown Community Health ("Eskenazi") did not prove by clear and convincing evidence that he was a danger to others or that he was "gravely disabled." Concluding that there was sufficient evidence that C.C. was dangerous to others, we affirm.

We affirm.

# Issue

Whether there was sufficient evidence to support the trial court's order for C.C.'s involuntary temporary civil commitment.

# Facts

On October 24, 2019, C.C.'s mother filed an application for emergency detention seeking to detain C.C. at Eskenazi. C.C.'s mother had concerns about decompensation in C.C.'s behavior and about delusional thoughts that he

---

[1] In *Civil Commitment of T.K. v. Dep't of Veterans Affairs*, 27 N.E.3d 271, 273 n.1 (Ind. 2015), the Indiana Supreme Court explained:

> In Indiana, an adult person may be civilly committed either voluntarily or involuntarily. Involuntary civil commitment may occur under four circumstances if certain statutorily regulated conditions are satisfied: (1) "Immediate Detention" by law enforcement for up to 24 hours; "Emergency Detention" for up to 72 hours; (3) "Temporary Commitment" for up to 90 days; and (4) "Regular Commitment" for an indefinite period of time that may exceed 90 days.

(internal citations omitted).

was having that seemed to be getting worse. A few days later, Eskenazi filed a Report Following Emergency Detention. This report included a physician's statement signed by Dr. Stephen Brandt ("Dr. Brandt"), who diagnosed C.C. with Schizophrenia. Dr. Brandt also stated that C.C. "ha[d] voiced threats to harm [a] former professor, his staff, [a] former psychologist associated with [the] university, ha[d] [sent] text messages stating desire to harm, [which] ha[d] resulted in several Duty to Warn calls." (App. Vol. 2 at 18). The trial court ordered C.C. to be detained for an evidentiary hearing to be held on November 1.

[4] At the evidentiary hearing, Dr. Brian Hart ("Dr. Hart"), the psychiatrist who treated C.C. while he was on the Eskenazi mental health unit, C.C.'s mother and father, and C.C. all testified. Dr. Hart explained that when C.C. arrived on the unit, he was "quite agitated[]" and "very disruptive, physically posturing to the psychiatric residents." (Tr. 7). As a result, C.C. was sedated and placed in a seclusion room. Dr. Hart testified that he had reviewed C.C.'s medical records, which indicated that C.C. had been treated for mental illness in the past and had previously been subject to commitment for treatment for his mental illness. Dr. Hart opined that, based on his observations and review of C.C.'s medical records, C.C. suffered from Delusional Disorder Persecutory Type and lacked insight into his mental illness.

[5] Dr. Hart noted that "[C.C.] has displayed a persisting delusional concern about various members at IU persecuting him, forging his name and he has . . . repeatedly referred to it as torture and manslaughter[,]" and that this persisting

persecutory belief had been ongoing since 2014. (Tr. 8). When asked whether C.C. was dangerous to others, Dr. Hart stated, "I do have concerns that he could potentially pose a danger to the people at IU that he believes are persecuting him." (Tr. 9). Dr. Hart further explained that "the decompensation of [C.C.'s] condition has resulted in a very hostile relationship where his mother is beginning to feel threatened. And so[,] I do not know for her own safety, how much longer she is going to be able to continue to support him." (Tr. 10).

[6] C.C.'s mother detailed the course of C.C.'s eleven-year history of mental illness. She explained that C.C. had had three prior hospitalizations and that his mental condition had continued to decline. C.C.'s mother testified that she felt physically threatened by her son. She described an incident that occurred in the summer of 2019 wherein she and C.C. attended a baseball game. During the game, C.C. screamed at his mother to the extent that an employee approached them to ask if everything was okay. As C.C. and his mother left the game, C.C. screamed at his mother about his delusions, and he took a "very intimidating posture" with his fists clenched. (Tr. 22).

[7] Following the incident at the baseball game, C.C.'s mother communicated with C.C. through text messages, occasional calls, and voicemails. C.C. regularly sent his mother text messages regarding his belief that she was not being honest with him about her involvement in speaking with I.U. officials. On some days, C.C.'s mother received "29-30 messages from him that [were] all just – just discombobul[ated], fragmented sentences, angry, [and] accusatory[.]" (Tr. 25).

C.C.'s mother testified that she had also received "text messages about [the] execution of judges that will not help him." (Tr. 25).

[8] C.C.'s father, a former police officer, further explained C.C.'s mental condition as follows:

> And in particular, there was a group of people at IU that he was – that were after him, did horrible things to him. One particular . . . [C.C.] indicated he showed him videos of guns, he drugged him, he raped him repeatedly, he moved his body, he tortured him, he inserted wire into his penis and into his chest. And [C.C.] wanted my help in getting him and other people that had done horrible things to [C.C.]. And I – I explained to [C.C.], I know his perception is reality but there was – you know, I needed probable cause in which I did not have.

(Tr. 33). C.C.'s father stated that he was concerned when C.C. used the word "executed[,]" explaining that "I do not feel like [C.C.] is a threat to me but I . . . would not want him in a room with these people mentioned at IU – there [are] about 5 or 6 of them. I fear that [C.C.], he is like . . . ready to boil over." (Tr. 34).

[9] C.C. testified that he sends weekly "rage texts" to his mother but claimed that he would never physically assault her. (Tr. 43). C.C. explained:

> Well I just want to restate, [mother] and [father] have said that there is a decline in our relationship. Our relationship got into a fight when [mother] kept lying to me about talking to the university. I do not think dad has lied that much[;] he just doesn't want to talk about it. But that is what these nasty text messages started from. [My mother] would not tell me about a conversation she had with the university that I might still want to go to the police over.

(Tr. 41).  C.C. further testified that he "[did] not know" if he needed medication but that he "[g]enerally[]" knew why he was given medication.  (Tr. 43).

[10]   At the conclusion of the hearing, the trial court granted the petition for C.C.'s temporary commitment.  The court explained:

> At this time the court will find that the evidence today presented by the doctor, by both parents shows that the respondent is suffering from a mental illness under Indiana law and is currently gravely disabled in that there is a substantial impartment of judgment that is affecting his ability [to] function.  And also, that there is a danger to others.  The courts have previously found that the trial court does not have to wait until an individual commits a physical act before determining that there is a substantial risk of harm to others.

(Tr. 46).  The court ordered that C.C. take all medications as prescribed, attend all clinic sessions as scheduled, and maintain his address with the court, as well as not harass or assault family members or others.  C.C. now appeals.

## Decision

[11]   C.C. contends that there was insufficient evidence to support his involuntary temporary commitment because Eskenazi did not prove by clear and convincing evidence that he was dangerous or gravely disabled.[2]  "'[T]he purpose of civil commitment proceedings is dual:  to protect the public and to ensure the rights of the person whose liberty is at stake.'"  *T.K. v. Dep't of*

---

[2] C.C.'s 90-day temporary commitment has expired, and therefore, the issue is moot.  However, the issue is one of great importance that is likely to recur.  Accordingly, we will address the issue on its merits.  *See Golub v. Giles*, 814 N.E.2d 1034, 1036 n.1 (Ind. Ct. App. 2004), *trans. denied*.

*Veterans Affairs*, 27 N.E.3d 271, 273 (Ind. 2015) (quoting *In re Commitment of Roberts*, 723 N.E.2d 474, 476 (Ind. Ct. App. 2000)). The liberty interest at stake in a civil commitment proceeding goes beyond a loss of one's physical freedom, and given the serious stigma and adverse social consequences that accompany such physical confinement, a proceeding for an involuntary civil commitment is subject to due process requirements. *Id.*

[12] To satisfy the requirements of due process, the facts justifying an involuntary commitment must be shown by clear and convincing evidence. *In re Commitment of G.M.*, 743 N.E.2d 1148, 1151 (Ind. Ct. App. 2001). Clear and convincing evidence is defined as an intermediate standard of proof greater than a preponderance of the evidence and less than proof beyond a reasonable doubt. *T.D. v. Eskenazi Midtown Cmty. Mental Health Ctr.*, 40 N.E.3d 507, 510 (Ind. Ct. App. 2015). In order to be clear and convincing, the existence of a fact must be highly probable. *Id.* When we review the sufficiency of the evidence supporting an involuntary commitment, we will affirm if, "considering only the probative evidence and the reasonable inferences supporting it, without weighing evidence or assessing witness credibility, a reasonable trier of fact could find [the necessary elements] proven by clear and convincing evidence." *T.K.*, 27 N.E.3d at 273. (quotation and citation omitted).

[13] To obtain an involuntary commitment, the petitioner is "required to prove by clear and convincing evidence that: (1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." IND. CODE § 12-26-2-5(e) (format altered). Because

this statute is written in the disjunctive, Eskenazi need only prove that C.C. is "either dangerous *or* gravely disabled." *Id.* (emphasis added); *see also M.Z. v. Clarian Health Partners*, 829 N.E.2d 634, 637 (Ind. Ct. App. 2005) ("It is important to note that in order to carry its burden of proof, Clarian only had to prove that M.Z. was either gravely disabled *or* dangerous. It did not have to prove both of these elements.") (emphasis in original), *trans. denied*.

[14] On appeal, C.C. does not dispute that he is mentally ill. Rather, he argues that there was insufficient evidence to support the trial court's conclusion that, as a result of his mental illness, he is dangerous to others or gravely disabled. Because we conclude that the evidence is sufficient to show that C.C. was dangerous to others, we need not address the trial court's findings regarding whether C.C. was gravely disabled.

[15] "Because everyone exhibits some abnormal conduct . . . loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior. There is no constitutional basis for confining a mentally ill person who is not dangerous and can live safely in freedom." *In re Commitment of T.K.*, 993 N.E.2d 245, 249 (Ind. Ct. App. 2013) (internal quotation marks and citation omitted), *trans. denied*. Dangerous is defined as "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." I.C. § 12-7-2-53. This court has further explained that:

> Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's

dangerousness would not occur but for the person's mental illness. This standard is not met by a showing that a person made a rational and informed decision to engage in conduct that may have entailed a risk of harm. Instead, the evidence must show that there is a substantial risk that the person will harm himself [or others] as a result of a psychiatric disorder which substantially disturbs the person's thinking, feeling, or behavior and impairs the person's ability to function.

*In re Commitment of C.A. v. Center for Mental Health*, 776 N.E.2d 1216, 1218 (Ind. Ct. App. 2002) (quotation marks and citations omitted). Importantly, a trial court is not required to wait until harm has nearly or actually occurred before determining that an individual poses a substantial risk to others. *C.J. v. Health & Hosp. Corp. of Marion Cty.*, 842 N.E.2d 407, 410 (Ind. Ct. App. 2006).

[16] Here, the evidence reveals that a mentally ill C.C. exhibited delusions of persecution, as evidenced by his belief that he was the victim of rape, torture, and theft at the hands of I.U. officials. Dr. Hart testified that because of C.C.'s mental illness, he was concerned that C.C. could pose a danger to the safety of his mother and I.U. officials. In addition, Dr. Hart stated that he had reviewed C.C.'s medical records, which indicated that C.C. had been treated for mental illness in the past and that, when C.C. was admitted to Eskenazi, he was "agitated[]" and "very disruptive, physically posturing to the psychiatric residents." (Tr. 7). Dr. Hart testified that C.C. did not have any insight into his mental illness and does not believe that he is suffering from any symptoms.

[17] C.C.'s mother testified that C.C. had been verbally assaultive and that she had felt physically threatened him. She explained that C.C. regularly sent her text messages regarding his belief that she was not being honest with him about her

involvement in speaking with I.U. officials. She further testified, which was corroborated by testimony from C.C.'s father, that C.C. had discussed the execution of officials at I.U. and judges who will not help him. Furthermore, C.C.'s father, a former police officer, expressed his concern for the safety of the individuals at I.U., stating that he "would not want [C.C.] in a room" with those individuals. (Tr. 34).

[18] Although C.C. has no history of violence upon another individual, this does not preclude the trial court from finding that C.C. was dangerous to others. *See T.K.*, 993 N.E.2d at 250 (concluding that evidence of threats and hostility towards hospital staff and T.K.'s denial that he suffers from mental illness established that T.K. was a danger to others). Because the evidence in the record before us supports the trial court's determination that C.C. is a danger to others, we affirm the trial court's commitment order.

[19] Affirmed.

Bradford, C.J., and Baker, J., concur.