**In the Matter of the COMMITMENT OF Patrick T. GERKE.**

**No. 01A02–9711–CV–769.**

Court of Appeals of Indiana.

June 17, 1998.

**OPINION**

SULLIVAN, Judge.

Appellant, Patrick Gerke (Gerke), appeals the trial court's order of involuntary commitment for a period to exceed ninety days. Such commitments are referred to as "regular" commitments (I.C. 12–26–7) as distinguished from "temporary" commitments for ninety days or less (I.C. 12–26–6).

We affirm.

Gerke presents two issues upon appeal, which we restate as follows:

(1) Whether sufficient evidence supported the trial court's determination that, as a result of his mental illness, there was a substantial risk Gerke would harm others.

(2) Whether the trial court erred in permitting the deputy prosecutor to represent the petitioner in a private commitment proceeding.

Gerke receives governmental assistance due to a disability determination that he suffers from a form of schizophrenia. His sister, Peggy Huntley (Huntley), is the representative payee, and manages his finances by paying his monthly bills and giving him a weekly allowance for spending money. Gerke's mother often assists him by purchasing groceries and laundering his clothes.

In early 1996, Gerke was committed to the Richmond State Hospital, and was subsequently released in July, 1996. After his release, Gerke was prescribed Prolixin to control his behavior. Gerke continued to take the medication until some time in February of 1997, when he unilaterally decided to stop.

On or about July 29, 1997, Gerke called his mother and requested that she bring his checkbook to his apartment because he needed to purchase some pop and milk. Although he expected the trip would take only fifteen to twenty minutes, his mother did not arrive for over one hour. Upon her arrival, Gerke discovered his mother had already purchased the soft drinks and milk. He then asked his mother either to do his laundry, or give him money so that he could do it. His mother refused both requests. Gerke became angry and kicked in the side of his stepfather's car

Jeremy W. Brown, Miller, Scott & Brown, P.C., Decatur, for Appellant.

which had been used by Gerke's mother to drive to the apartment.

On July 30, 1997, Huntley filed an Application for Emergency Detention. In the Application, Huntley alleged that Gerke was: "mentally ill, dangerous and in need of immediate restraint for the following reasons: [t]hreatening his mother, damaging property, very [violent] & out of reality." Record at 22. Cameron Nelson, a physician at the Lindenview Hospital (Lindenview) in Fort Wayne, also alleged in the detention application that Gerke was "delusional with violent acts towards others." Record at 22. Based upon the application, the trial court signed an Order for Emergency Detention on July 30, 1997, and Gerke was detained at Lindenview. Al Hackman (Hackman), Gerke's stepfather, filed a Petition for Involuntary Commitment on August 4, 1997.

During his detention at Lindenview, between July 30 and August 8, Dr. Larry P. Lambertson (Lambertson), the medical director of Park Center Hospital in Fort Wayne, examined Gerke daily. The examinations would last between fifteen to twenty minutes on days when Gerke was communicative, but only a few minutes on days when Gerke refused to talk. As a result of his examinations, Lambertson diagnosed Gerke with Intermittent Explosive Disorder. Lambertson stated that he could not disagree with a previous diagnosis of Schizo–Affective disorder, but he had not observed the presence of that condition at the time of Gerke's detention.

At the hearing, Lambertson testified that a regular commitment (one lasting longer than 90 days) was necessary because he did not believe Gerke would maintain consistency with his medication. Lambertson concluded that without medication, Gerke was a danger to others. The trial court ordered that Gerke be committed to the Richmond State Hospital for a period to exceed ninety days.

At the hearing, Zane R. Zwick (Zwick), Deputy Prosecuting Attorney of Adams County, represented Hackman, although the commitment proceedings were initiated by Hackman, a private citizen. Gerke never objected to Zwick's representation of Hackman.

In order to support an involuntary regular commitment, a petitioner must prove, by clear and convincing evidence, that the individual in question is: "(1) . . . mentally ill and either dangerous or gravely disabled; and (2) [d]etention or commitment of that individual is appropriate." I.C. 12–26–2–5(e) (Burns Code Ed.Repl.1997). Gerke does not challenge the trial court's determination that he is mentally ill; rather, he contests its determination that he is "dangerous".

"Dangerous", for purposes of I.C. 12–26, is defined as: "a condition in which an individual as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." I.C. 12–7–2–53 (Burns Code Ed.Repl.1997). "[t]he statutory standard can be met only with clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for that person's mental illness." *Commitment of J.B. v. Midtown Mental Health Center* (1991) Ind.App., 581 N.E.2d 448, 452, *trans. denied.*

In this instance, Gerke does not contest that the behavior used as evidence of Gerke's dangerousness would not have occurred "but for" his mental illness.[1] Rather, he maintains the trial court erred in its determination "that unless there is medication administered and taken that [Gerke] does present a substantial risk of harming others . . . ." Record at 110–11. As support for his position, Gerke notes the absence of any evidence that he ever harmed another person. He claims the only evidence supporting a finding that he presented a danger to others was Dr. Lambertson's testimony: "I feel he is a dan-

---

1. Although the dangerous behavior predicted by the trial court necessitating commitment would not occur "but for" Gerke's mental illness, Dr. Lambertson testified he believed with medication and treatment the condition could be alleviated. Hackman testified that Gerke was "a fine boy as long as he takes his medication." Record at 52. Huntley testified that "if he would take the medication and just keep taking it and go to his counseling he is a very very wonderful person." Record at 69.

ger to other people without treatment." Record at 37.

The record corroborates Gerke's contention that he has never, as a result of his mental illness, harmed another person. Although Gerke has a long history of making violent threats to family, there has never been a single episode in which those threats elevated into any type of physical attack.[2] Gerke contends that, because he has only made threats, but has never harmed another person, the court's commitment determination was based upon a mere unsupported perception that Gerke "could" be dangerous, and as such, was improper.

This court recognizes the extraordinary curtailment of liberty involved with a commitment to a mental hospital. Recognizing that the loss of liberty produced by an involuntary commitment involves even more than a loss of freedom as a result of confinement, the court in *Commitment of J.B., supra*, 581 N.E.2d at 451, cautioned that, in cases where a court contemplates commitment premised upon a prediction of future dangerousness:

"[T]he court must exercise extreme caution that it not utterly strip a person suffering from mental illness of the power to make an informed decision concerning risk-taking.... If every idiosyncratic decision entailing some risk of harm made by a mentally ill person exposed him to the possibility of involuntary commitment, there would be an unacceptable risk that the individual is losing his liberty solely because he is afflicted with a mental illness requiring treatment. This is an impermissible result." (Citation omitted).

In *Addington v. Texas* (1979) 441 U.S. 418, 427, 99 S.Ct. 1804, 1810, 60 L.Ed.2d 323, the United States Supreme Court expressed a strong concern that involuntary commitments might be made on the basis of a few isolated instances of unusual conduct which were otherwise generally acceptable. "[S]ince everyone exhibits some abnormal conduct at one time or another, 'loss of liberty calls for a showing that the individual suffers from something more serious than is demonstrated by idiosyncratic behavior.'" *Commitment of J.B., supra*, 581 N.E.2d at 450, quoting *Addington, supra*, 441 U.S. at 427, 99 S.Ct. at 1810. This concern applies equally to the inherently problematic determination of future dangerousness. *Id.*

In *Commitment. of J.B., supra*, this court reversed the involuntary commitment of a thirty-one year old female, J.B., who suffered from alcoholism. On three occasions, J.B. was so intoxicated that her mother had to go out to retrieve her. On the first two occasions, J.B. initially went along with her mother, but when her mother's car was stopped at a busy intersection, she got out of the car and ran away through traffic. On the third occasion, J.B. did not get into her mother's car, she instead flagged down a car containing several young men and left in the car with them. The physician who examined J.B. during her emergency detention testified that J.B. was a danger to herself.

In reversing the trial court's decision, this court held the evidence presented fell short of the clear and convincing standard. Specifically, the court determined that, despite the "risky" nature of J.B.'s conduct, there was "no inherent showing in [her] conduct that it would not occur but for her mental illness." *Id.* at 452.

---

**2.** Prior to his admission at Lindenview, Gerke told Lambertson that he was planning to kill his mother and that if Lambertson wouldn't let him leave the hospital he would make a phone call and arrange to have it done. Hackman testified Gerke started getting worse after he quit taking his medication and would threaten everybody including his mother. However, he also stated that while Gerke would "threaten his mother threaten everybody, a lot of people ... as far as actually doing anything I don't believe he ever did anything, he never hit nobody or nothing. I mean he has never damaged no property other than that I know of." Record at 56. Huntley

testified that "he gets mad, he has threatened probably all of us at one point in time when he was you know when he is angry." Record at 65. She noted that previous to a 1996 commitment, Gerke threatened to "rip my mom's blankety head off and then he called the house and talked to my other sister and told her that he was going to do the same thing...." Record at 66. However, Huntley also testified that she had never seen Gerke act physically violent toward another person, and that, other than the incident involving her stepfather's automobile, she had never seen him purposely damage anything.

The court was unable to determine that clear and convincing evidence supported the conclusion that J.B.'s conduct would not have occurred but for her mental illness because her conduct was motivated, at least in part, by her desire to escape from her mother. While recognizing that exiting an automobile in the middle of a crowded intersection is not a choice most members of society would make, the court nevertheless held that something more than a mere showing that a mentally ill person has taken a risk is needed to justify an involuntary commitment. *Id.* at 451.

Gerke contends that his conduct is precisely the type of idiosyncratic behavior that was inadequate to warrant commitment in *Commitment of J.B.* However, his reliance on the result in that case is misplaced in that the instant case differs from the situation in *Commitment of J.B.* in several significant aspects.

In *Commitment of J.B.*, the issue was whether the conduct relied upon to support commitment occurred as a result of J.B.'s mental illness. The court determined there was not clear and convincing evidence that J.B.'s conduct was due to her mental illness. It therefore necessarily follows that, had the court been convinced that J.B.'s arguably idiosyncratic behavior resulted solely from her mental illness, a different result may have been reached. In our case, Gerke does not contest, for purposes of this appeal, that his behavior was a result of his mental illness (and his refusal to take prescribed medication). Therefore, unlike J.B.'s conduct, Gerke's behavior was not attributed to a cause other than his mental illness.

Moreover, Gerke's reaction to his confrontation with his mother is not the type of idiosyncratic, risky behavior which might fall within an acceptable range of conduct. *See*

*Addington, supra,* 441 U.S. at 427, 99 S.Ct. at 1810. J.B.'s behavior, while risky, could arguably be described as paralleling the type of idiosyncratic behavior mentioned in *Addington.* In other words, while it may have been risky and dangerous for J.B. to exit her mother's vehicle into a crowded intersection, given her motivation to escape a stressful and unpleasant situation, her choice was not necessarily indicative of someone who presented a substantial risk of harming themselves due to a mental illness.

In our case, Gerke's violent and previously unprecedented reaction to his mother's purchase of groceries and refusal to launder his clothes did not involve the same type of risk-benefit decision-making process. Gerke did not make a risky or dangerous choice in order to avoid a threatening, stressful, or unpleasant situation. Instead, Gerke, unable to control his emotions, reacted in an uncontrolled and violent manner which resulted in damage to property.

We agree with Gerke that, because of the severe deprivation of liberty involved, an isolated instance of property damage, combined with an unsupported perception that a person "could" be dangerous, without more, does not warrant involuntary commitment. This is especially true when the individual involved has never exhibited prior behavior consistent with the conclusion that he presents a danger to others. However, we disagree with Gerke that the instant case presents such a situation.

Gerke has a mental illness which makes him prone to "episodes of rage or violence or loss of control which is not explained by the degree of stress in the environment." Record at 45. His problem is further exacerbated by his conceded antipathy towards taking his medication.[3] It is instructive that, prior

---

**3.** To the extent that Gerke provides subjective reasons for his unwillingness to take Lithium, that does not detract from our conclusion that commitment was proper under the circumstances. Dr. Lambertson testified that, until February of 1997, Gerke had been on Lithium (here the record is somewhat conflicting, as Hackman's and Gerke's testimony seem to indicate Gerke was taking Prolixin at that time), whereupon Gerke stopped taking the medication be-

cause "he decided that he didn't need it and refused to take it." Record at 38.

Gerke agreed to begin taking Lithium, which typically takes a couple of weeks to take effect, the Thursday before the commitment hearing. Gerke testified at the commitment hearing that he felt the Lithium was giving him diarrhea and that sometimes his vision was blurry. He also stated that he has a urinary problem and a heart murmur, however after informing the doctors at Lindenview of these conditions, they nonetheless

to the most recent episode, family members were unable to remember a single incident in which Gerke attacked another person or inflicted property damage. His actions were always limited to threats or verbal abuse. However, Gerke's reaction to this most recent confrontation indicates a clear departure from all past confrontations with family members, in that now he has shown the capability to express his anger with physical violence.

Therefore, clear and convincing evidence supported the trial court's conclusion that Gerke's mental illness, left untreated, presented a substantial risk that Gerke would harm others. A trial court is not required to wait until a physical act is visited upon an individual, as opposed to an automobile, before determining that an individual poses a substantial risk of harm to others. We disagree with Gerke's implication, albeit unstated, that a commitment premised upon a trial court's prediction of dangerous future behavior, without prior evidence of the predicted conduct, must be, in all cases, invalid. The old adage of "the dog gets one bite" does not, and should not, apply in the context of commitment proceedings, despite the severe restrictions on liberty imposed by commitment to a mental facility.

■ Gerke next maintains the trial court committed fundamental error by permitting the prosecuting attorney to represent Hackman during the commitment proceedings. He contends that allowing a deputy prosecutor to represent Hackman had a clear prejudicial effect upon his due process rights. We respectfully disagree.

■ Fundamental error is error which is a blatant violation of our concepts of fundamental fairness and in which the harm or threat of harm is substantial and apparent. *Allen v. State* (1997) Ind., 686 N.E.2d 760, *reh'g denied; Turner v. State* (1997) Ind., 682 N.E.2d 491. It is error which is so likely to have infected the verdict or judgment that confidence in the correctness of the trial result has been undermined. *Abdul–Musawwir v. State* (1996) Ind.App., 674 N.E.2d 972, *trans. denied; Hinkle v. State* (1990) Ind. App., 569 N.E.2d 349, *trans. denied.*

The trial court permitted Zwick to represent Hackman in his capacity as deputy prosecutor. I.C. 12–26–2–5(b) (Burns Code Ed. Repl.1997) states that "[a] petitioner may be represented by counsel." I.C. 12–26–2–5(c) (Burns Code Ed.Repl.1997) provides: "[t]he court may appoint counsel for a petitioner upon a showing of the petitioner's indigency and the court shall pay for such counsel if appointed." The record provides no indication that Hackman was indigent.

I.C. 12–26–7–2(b) (Burns Code Ed.Repl. 1997), which concerns persons eligible to *file petitions* for commitment, provides:

"A proceeding for the commitment of an individual who appears to be suffering from a chronic mental illness may be begun by filing with a court having jurisdic-

---

decided to put him on Lithium. The existence of his urinary problem and the heart murmur were unrelated to his intake of either Prolixin or Lithium. Gerke, given the opportunity during direct examination, did not claim any worsening of his urinary problem or heart murmur due to Lithium. However, Gerke testified that he had no desire to stay on Lithium because of the other side effects, which he felt, were caused by the medication.

When Gerke was hospitalized at Richmond State Hospital (Richmond) during his first commitment in 1996, he was prescribed Prolixin. He stated that Richmond initially put him on Prolixin, but later took him off. However, after discharge, Park Center put him back on it. After dismissal from Park Center, Gerke told a therapist at the Caylor Nickel Treatment Center that he quit taking the Prolixin because he wondered why Richmond had taken him off the drug, and that he felt it was "messing up my nerves and

everything else." Record at 98. However, the record reveals that Richmond may have taken Gerke off Prolixin due to a diagnosis of an alcohol and drug problem.

It was Dr. Lambertson's opinion that outpatient treatment would be adequate once Gerke was stabilized with Lithium, but if that didn't work, he could possibly go back on Prolixin. Dr. Lambertson believed that a regular commitment (one exceeding 90 days) was necessary because it was needed to maintain consistency with the new medication.

In light of all the testimony, clear and convincing evidence supports the conclusion that if merely required to participate in an out-patient treatment without the structure provided by regular commitment, Gerke would be unable to maintain a program of medication and, consequently, would continue to present a substantial threat to the safety of others.

tion a written petition by any of the following:

 (1) A health officer.

 (2) A police officer.

 (3) A friend of the individual.

 (4) A relative of the individual.

 (5) The spouse of the individual.

 (6) A guardian of the individual.

 (7) The superintendent of a facility where the individual is present.

 (8) A prosecuting attorney in accordance with I.C. 35–36–2–4

 (9) A prosecuting attorney or the attorney for a county office if civil commitment proceedings are initiated under I.C. 31–34–19–3 or I.C. 31–37–18–3."

Gerke maintains that permitting Zwick to *represent* Hackman, a private petitioner, in an involuntary commitment proceeding was in clear contravention of I.C. 12–26–2–5, which states that a trial court may appoint counsel upon a showing of the petitioner's indigency. Gerke also contends that Zwick's representation had a clear prejudicial effect on his due process rights. We disagree.

A commitment proceeding may be initiated by a police officer under I.C. 12–26–7–2.[4] In such cases, the prosecuting or other government attorney would most likely represent the petitioning interests throughout the commitment proceedings. In this instance, the proceedings were initiated by Al Hackman, a relative of Gerke. Relatives are authorized to file petitions for regular commitment under the same enabling statute as police officers, I.C. 12–26–7–2.[5] Therefore, since police officers and relatives are authorized to file petitions for regular commitment under the same statutory provision, and the government may properly represent police officers, we do not read I.C. 12–26–2–5 as precluding such representation of private petitioners. We also note that I.C. 12–26–2–5 does not contain any language specifically precluding a prosecutor from *representing* private petitioners in regular commitment proceedings.

We recognize that an attorney charged with a public prosecutorial function may not serve as private counsel to parties in several situations. *See Matter of Richard W. Reed* (1986) Ind., 500 N.E.2d 1189, 1190. For example, the prosecuting attorney may not be retained as private counsel in personal-injury suits. However, unlike situations such as personal-injury suits, commitment proceedings do not present the same level of danger for conflicts of interest. Also, permitting a prosecuting attorney to represent private petitioners in regular commitment proceedings may be seen to serve the State's public policy interests in: (1) protecting the public from those who present a substantial risk of harm; and (2) ensuring that individuals suffering from mental illness are provided the appropriate level of care. We hold that it was not fundamental error for the trial court to permit Zwick to represent Hackman during the regular commitment proceedings.

The judgment of the trial court is affirmed.

KIRSCH and BAKER, JJ., concur.

---

4. Specifically, I.C. 12–26–7–2(b)(2) (Burns Code Ed.Repl.1997).

5. Specifically, I.C. 12–26–7–2(b)(4) (Burns Code Ed.Repl.1997).