## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Feb 10 2015, 10:42 am

*Kevin S. Smith*

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT

Carlos I. Carrillo
Lafayette, Indiana

ATTORNEYS FOR APPELLEE

Gregory F. Zoeller
Attorney General of Indiana

Kyle Hunter
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In Re: The Matter of the Commitment of T.S.

T.S.,

*Appellant-Respondent,*

v.

Logansport State Hospital,

*Appellee-Plaintiff*

February 10, 2015

Court of Appeals Cause No. 79A05-1406-MH-260

Appeal from the Tippecanoe Circuit Court.

The Honorable Donald L. Daniel, Judge.

Cause No. 79C01-0402-MH-8

**Riley, Judge.**

## STATEMENT OF THE CASE

Appellant-Respondent, T.S., appeals the trial court's Order of Regular Commitment after a Review Hearing, ordering his continued involuntary commitment at Logansport State Hospital.

We affirm.

## ISSUES

T.S. raises two issues on appeal, which we restate as follows:

(1) Whether the trial court erred by finding that clear and convincing evidence established that T.S. is mentally ill and presents a danger to others; and

(2) Whether his current commitment at the Logansport State Hospital is the least restrictive environment appropriate for T.S.

## FACTS AND PROCEDURAL HISTORY

On January 4, 2004, T.S. was released from incarceration after serving his sentence for two Counts of Class B felony child molesting. Approximately a month later, on February 5, 2004, T.S. was involuntarily committed at Logansport State Hospital (LSH) upon a finding that T.S. suffered from schizo-affective disorder and was gravely disabled. His original psychiatric evaluation

indicated a history of self-mutilation, substance abuse and psychosis, depressive and manic episodes. He was noted as being unable "to resist his sexual urges outside of [a] hospital setting." (Transcript p. 6). T.S. has remained involuntarily committed at LSH since February of 2004.

[5] During the course of his treatment, T.S. was diagnosed with "post traumatic stress disorder (PTSD), sexual disorder analyses, borderline [a] buoyant personality traits and poly substance dependence." (Tr. pp. 4-5). T.S. has progressed in his treatment program to the point where his treating physician, Dr. Danny Meadows (Dr. Meadows), now opines that T.S. "does not have a diagnosis of psychotic illness" and has not "had a significant self-harm action in recent memory." (Tr. p. 7). T.S.'s most recent clinical plan indicated that his PTSD is "controlled with treatment." (Respondent's Exh. 2).

[6] Throughout his treatment, it was noted that T.S. "had intermittent periods of gender identity issues as well as insecurity regarding some of his sexual issues." (Tr. p. 5). LSH deemed that T.S. "had predominant sexual issues which he had criminal activity for in the past which he was convicted of and [it] was felt from a clinical point of view that these issues were going to be detrimental to him." (Tr. p. 7). As a result, T.S. was referred to the Sexual Responsibility Unit (SRU) within LSH.

[7] The SRU is a program developed to treat male patients who have committed criminal or deviant sexual acts and who may have previously been incarcerated. *See Commitment of T.S. v. Logansport State Hosp.*, 959 N.E.2d 855, 856 (Ind. Ct.

App. 2011). The SRU has various levels, starting with education, and to move up to a higher level, the patient must demonstrate that he is changing his pattern of behavior regarding his sexual issues. *See id*. There is no set time for completion: while one patient may complete the different levels in six months, another may take years to complete the program. *See id*. Despite years in the program, T.S. has yet to complete the SRU's program. On October 25, 2010, T.S. sent a handwritten letter to the trial court, asking the court to support his refusal to participate in the SRU. *See id*. After a hearing, the trial court denied T.S.'s petition, concluding that it was in T.S.'s best interests to remain in the program. *Id*. at 857. On appeal, we affirmed the trial court's finding that T.S. was still in need of the treatment offered by the program and that the risks associated with the program were outweighed by the potential benefit that T.S. might receive. *Id*. at 860.

[8] Over the past two years, T.S. has endeavored to participate fully in the SRU's counseling programs and is making progress under the guidance of Dr. Meadows. T.S. was promoted to the highest privilege level and has been allowed to attend supervised outings into the community to assess his ability to handle situations around children and other high risk populations. During those outings, T.S.'s treatment team noticed an increase in T.S.'s anxiety which warranted an increase in his medications. The team also noted that T.S. "was minimizing what they would call [T.S.'s] arousal." (Tr. p. 35).

[9] On February 3, 2014, the trial court received a letter from T.S. requesting a hearing for review of regular commitment. On April 23, 2014, the trial court

conducted a hearing on T.S.'s petition. Thereafter, on May 23, 2014, the trial court issued its Order of Regular Commitment after a Review Hearing, finding that T.S. "is suffering from Post-Traumatic Stress Disorder, Polysubstance Dependence, Borderline Personality Traits and Avoidant Personality Traits, which are mental illnesses as defined in Ind. Code § 12-7-2-130." (Appellant's App. p. 13). After concluding that T.S. is dangerous to others, as defined in I.C. § 12-7-2-53, the trial court ordered continued custody, care and treatment at LSH for a period expected to exceed ninety days.

T.S. now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

### I. *Sufficiency of the Evidence*

T.S. contends that the State failed to present by clear and convincing evidence that he is mentally ill and gravely disabled or dangerous to others. When reviewing a challenge to the sufficiency of the evidence with respect to commitment proceedings, we look to the evidence most favorable to the trial court's decision and draw all reasonable inferences from that decision. *Commitment of M.M. v. Clarian Health Partners*, 826 N.E.2d 90, 96 (Ind. Ct. App. 2005). We neither reweigh the evidence nor judge the credibility of the witnesses. *Id*. If the trial court's commitment order represents a conclusion that a reasonable person could have drawn, we will affirm the order even if other reasonable conclusions are possible. *Id*.

[12] Upon review, we consider three factors to determine whether the totality of the circumstances support an involuntary commitment: "the gravity of the behavior leading to hospital admission, behavior in the hospital, and the relationship between problematic behaviors and the person's mental illness." *In re Commitment of T.K.*, 993 N.E.2d 245, 248 (Ind. Ct. App. 2013). In these proceedings, the burden falls on the petitioner to prove by clear and convincing evidence that: "(1) the individual is mentally ill and either dangerous or gravely disabled; and (2) detention or commitment of that individual is appropriate." I.C. § 12-26-2-5(e).

[13] In its Order of Regular Commitment after a Review Hearing, the trial court concluded that T.S. suffered from a mental illness which made him dangerous to others. Although in addition to the dangerousness requirement, T.S. also disputes the alternative prong of I.C. § 12-26-2-5(e)—the gravely disabled element—the trial court did not establish that finding and, as such, we will not address T.S.'s argument in that regard.

### A. *Mental Illness*

[14] In this context, mental illness is defined as "a psychiatric disorder that (A) substantially disturbs an individual's thinking, feeling, or behavior; and (B) impairs the individual's ability to function." I.C. § 12-7-2-130(1). Focusing on the absence of any self-mutilation episodes and the lack of any diagnosed psychotic illnesses, T.S. contends that he no longer suffers from any mental illness. Although he acknowledges to have suffered from PTSD and sexual

disorders, he considers his PTSD problem "resolved" and his inappropriate sexual activity under control. (Appellant's Br. p. 9).

[15] Originally, at his initial psychiatric evaluation during the intake at LSH in February of 2004, T.S. was described as "having a history of psychosis, depressive [a] manic episode." (Tr. p. 6). T.S. had self-mutilation issues and a substance abuse problem, in addition to "not [being] able to resist his sexual urges outside of [the] hospital setting." (Tr. p. 6). While we agree with T.S. that currently, he no longer has "a diagnosis of psychotic illness" and there have been no "significant self[-]harm action in recent memory," T.S. is still medically and statutorily considered mentally ill. (Tr. p. 7).

[16] During the hearing, Dr. Meadows testified that while T.S.'s difficulties with PTSD, stemming from past sexual abuse, remain, at the present time, it is managed and controlled with treatment. However, T.S.'s treatment plan report clearly indicates that T.S. is susceptible to "distress at exposure to cues related to traumatic events." (Respondent's Exh. 2).

[17] The record further supports that over the past two years, T.S. has been participating fully in the SRU program to address his sexual disorder and, unquestionably, is making progress under the guidance of Dr. Meadows. T.S. was recently promoted to the highest privilege level and has been allowed to attend supervised outings into the community to assess his ability to handle situations around children and other high risk populations. During those outings, T.S.'s treatment team noticed an increase in T.S.'s anxiety which

resulted in an increase in his medications. The team also noted that T.S. "was minimizing what they would call [T.S.'s] arousal." (Tr. p. 35). Unlike for his PTSD, T.S.'s treatment plan indicates that his deviant sexual behavior diagnosis remains in "active status." (Respondent's Exh. 1). So far, even though T.S. has made progress in the treatment of his mental illness and its underlying roots, no clinician has affirmed that T.S. is ready to be discharged. Thus, while T.S.'s diagnoses might be managed and under control, he is by no means 'cured.' Based on the evidence, the trial court reached a conclusion that a reasonable person could have drawn, and therefore we will affirm its finding that T.S. is mentally ill.

### B. *Dangerous*

[18] Turning to the dangerousness prong, T.S. claims that the State failed to establish that he presents a substantial risk to harm others. Within the province of commitment proceedings, "dangerous" means "a condition in which an individual[,] as a result of mental illness, presents a substantial risk that the individual will harm the individual or others." I.C. § 12-7-2-53. "Dangerousness must be shown by clear and convincing evidence indicating that the behavior used as an index of a person's dangerousness would not occur but for that person's mental illness." *In re Commitment of C.A.*, 776 N.E.2d 1216, 1218 (Ind. Ct. App. 2002). In other words, abnormal risk-taking will not support a finding a person is dangerous as defined by statute, unless that risk-taking is caused by mental illness. *Commitment of J.B. v. Midtown Mental Health Ctr.*, 581 N.E.2d 448, 452 (Ind. Ct. App. 1991), *trans. denied*. However, a trial

court is not required to wait until harm has nearly or actually occurred before determining that an individual poses a substantial risk of harm to others. *Matter of Commitment of Gerke*, 696 N.E.2d 416, 421 (Ind. Ct. App. 1998) (holding that a commitment premised upon a trial court's prediction of dangerous future behavior, without prior evidence of the predicted conduct, was valid, and observing "[t]he old adage of 'the dog gets one bite' does not, and should not, apply in the context of commitment proceedings, despite the severe restrictions on liberty imposed by commitment to a mental facility").

[19] Characterizing Dr. Meadows' testimony that there is a threat he might commit a sexual act in the future as purely speculative, T.S. likens his situation to *In re Commitment of Steinberg*, 821 N.E.2d 385 (Ind. Ct. App. 2004), in which we reversed a finding of dangerousness. In *Steinberg*, Steinberg was admitted to the emergency room after believing that he heard his roommates speak though his computer speakers. *Id.* at 386. Steinberg also had periods of incontrollable anger and had, in a single incident, pointed an unloaded gun at people who had threatened him and his roommate. *Id.* at 387. Upon evaluation, Steinberg was determined to be schizophrenic and found to be dangerous to others. *Id.* at 388. Affirming the trial court's conclusion of mental illness, we nevertheless reversed its finding of dangerousness because Steinberg's mother's testimony pointing to "any potential for danger . . . was purely speculative[.]" *Id.* While the incident of the unloaded gun "may have been risky behavior," we considered it "too slender a thread to support an involuntary commitment." *Id.* at 389.

As part of his mental illness diagnosis, Dr. Meadows testified that T.S. has a sexual disorder, with intermittent periods of gender identity issues as well as insecurity regarding some of his sexual issues. Because T.S. has difficulty resisting his sexual urges outside of the hospital setting, he was convicted of two Counts of Class B felony child molestation. Since T.S.'s admittance into the SRU, T.S. has made advancements into managing his disorder to the point where T.S. was promoted to participate in outings into the community after having been separated from children and other high risk populations for more than ten years. Because T.S.'s behavior during these community outings raised serious concerns with T.S.'s treatment team, Dr. Meadows opined that, until T.S. had fully completed the SRU program, T.S. remains a danger to others when he is in the community.

While the speculative facts in *Steinberg* dictated a reversal of the trial court's finding of dangerousness, the facts here do not warrant the same result. T.S. has an established history of harming others. Based on the evidence, it is clear that, despite appropriate treatment and progress, T.S.'s sexual disorder is still affecting his behavior, emotions and thoughts, and impedes his ability to function in an appropriate fashion while in the community. Considering the totality of the circumstances, we affirm the trial court's conclusion that T.S. presents a substantial danger to others. *See* I.C. § 12-7-2-53.

## II. *Least Restrictive Environment*

[22] Repeating the argument developed in his previous appeal, T.S. again disputes the appropriateness of continued placement in the SRU and contends that the State failed to establish by clear and convincing evidence that the probable benefits of the SRU outweigh any risk of harm to T.S.

[23] In the *Commitment of T.S.*, T.S. contested his forcible participation in the SRU. Comparing the legal precedents of forcible medication with the issue of forcible participation in a therapeutic program, we noted that "counseling and therapy are most often focused on behavior, and it is behavior that society is concerned with in individuals like T.S., with a history of criminal, sexual misconduct. *Commitment of T.S.*, 959 N.E.2d at 859. We applied the relevant portions of the existing legal framework with respect to mandatory medication to the situation before us, and concluded that in order to forcibly enroll T.S. in counseling, the State was required to prove by clear and convincing evidence that: "(1) a current and individual assessment of T.S. had been made; (2) that this assessment resulted in the honest belief of the medical professions that T.S.'s continuation in the [SRU] would be of substantial benefit to treating T.S.'s condition and controlling his behavior; and (3) that the probable benefits of the [SRU] outweighed any risks of harm to T.S. and his personal concerns." *Id*. at 859-60.

[24] Admittedly, much has changed since T.S.'s last appeal. T.S. has started to participate in the SRU program and has made great strides in the management of his sexual disorder. However, not a single clinician treating T.S. endorses his request for discharge from the program. Dr. Meadows testified that his

recommended treatment plan is for T.S. to complete the SRU program and then to be transitioned into the community so as to minimize the risk for relapse. Opining that the SRU is currently the least restrictive environment suitable for T.S.'s care and needs, Dr. Meadows clarified that when T.S.'s transition into the community occurs, the SRU will also ensure that T.S. will continue to have access to therapeutic services and treatments to deal with the ensuing difficulties of his new environment. While we empathize with T.S.'s lengthy residency in the SRU, we are impressed by his progress and it is clear from Dr. Meadows' testimony that the SRU program offers significant benefits to T.S. in progressing him to his eventual reintegration into society. Nevertheless, until the impact of community outings on T.S. can be more thoroughly assessed and "until he has fully completed [the SRU]," his current commitment outweighs any risks of harm to T.S. (Tr. p. 11). Therefore, we refuse to disturb T.S.'s current placement, and affirm the trial court's order of continued commitment to the SRU at LSH.

## CONCLUSION

Based on the foregoing, we conclude that clear and convincing evidence established that T.S. is mentally ill and presents a danger to others, thereby justifying a continued involuntary mental health commitment; and his current placement in LSH's SRU is appropriate.

Affirmed.

Vaidik, C. J. and Baker, J. concur