


FILED
Aug 30 2024, 9:32 am
CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

IN THE

# Court of Appeals of Indiana

In the Matter of the Civil Commitment of:
H.J.,

*Appellant-Respondent*

v.

Health & Hospital Corporation
d/b/a Sandra Eskenazi Mental Health Center,

*Appellee-Petitioner*

---

August 30, 2024

Court of Appeals Case No.
24A-MH-478

Appeal from the Marion Superior Court

The Honorable David J. Certo, Judge
The Honorable Denise F. Hayden, Judge Pro Tempore

Trial Court Cause No.
49D08-2401-MH-3858

---

**Opinion by Judge Weissmann**
Judges Vaidik and Foley concur.

**Weissmann, Judge.**

[1] H.J. threatened his brother with a knife while his brother was holding an infant. Thereafter, the trial court involuntarily committed H.J. for mental health treatment. Although this temporary commitment has expired, H.J. appeals, contending the trial court erred by denying his counsel the opportunity for closing argument at the commitment hearing. H.J. also challenges the trial court's order requiring him to take medication he wished to avoid. Eskenazi Health asks us to either dismiss the appeal as moot because the commitment has expired or to affirm the trial court's judgment.

[2] We find this appeal falls within an exception to the mootness doctrine, but we affirm on the merits.

## Facts

[3] H.J. brandished a knife during an argument with his younger, unarmed brother, who was holding a 10-month-old child at the time. H.J., who believed he was merely defending himself against his brother's threatening actions, called police. Even after police arrived, H.J. did not immediately discard the knife and ultimately was transported by police to a hospital operated by Eskenazi. H.J. was admitted to the hospital's psychiatric unit the next day.

[4] Dr. Kenneth Smith, a psychiatrist, examined H.J., who reported that he had been hospitalized under "false pretenses" after a dispute with "imposters" posing as his mother and brother. Tr. Vol. II, p. 8. When Dr. Smith asked H.J. whether he had been sleeping lately, H.J. responded by saying "[F]ive hundred synonyms is an attribute I cherish slightly to pay homage to that type of behavior." *Id.* at 9. The next day, when asked whether he was having difficulty organizing his thoughts, H.J. replied that "there's got to be a success rank higher than normal from people trying to hinder your success trilogy[,] I guess[,] of living a normal American dream." *Id.* at 9-10.

[5] Eskenazi filed a request for emergency detention of H.J., alleging that he was suffering from a psychiatric disorder and was a danger to others or gravely disabled. The trial court granted the request but ordered Eskenazi to file a request for hearing within seven days of H.J.'s admission if Eskenazi viewed a temporary or regular commitment as necessary. Eskenazi immediately petitioned for a hearing, seeking H.J.'s temporary commitment. Eskenazi also sought an order requiring H.J. to take all medications as prescribed, attend all scheduled clinic sessions, maintain his address and telephone number on record if H.J. were placed in an outpatient commitment, and avoid harassing or assaulting his family or anyone else.

[6] On the morning of the temporary commitment hearing, Dr. Smith spoke to H.J. about what H.J. might do upon his release if the temporary involuntary commitment were denied. H.J. began talking about being afraid of people in the community. When asked whether he "might go after these people," H.J.

responded, "It's more real property dispute[.] I still have a case in another state." *Id.* at 10. H.J. also expressed a need for police protection or a firearm to protect him against two men, including his brother.

[7] At the hearing, Dr. Smith testified that H.J. suffered from an unspecified psychotic disorder that caused him to suffer delusions, significant thought disorganization, and impairment of his judgment and reasoning. H.J. consistently refused the antipsychotic medication, Risperidone, prescribed for him during his then five-day stay at the hospital. H.J. also demonstrated no insight into his mental illness, a factor that Dr. Smith associated with H.J.'s poor compliance with treatment. Dr. Smith recommended a regular commitment but acknowledged even a temporary commitment could help stabilize H.J.'s condition.

[8] Although Dr. Smith had been unable to determine H.J.'s specific treatment history from H.J., H.J.'s mother filled in the gaps through her testimony at the commitment hearing. She reported that "right before the pandemic," H.J. had been hospitalized for a few days at "Katherine Hamilton's in Terre Haute" without any resulting change in his behavior. *Id.* at 31. H.J. later completed a six-month commitment at Richmond State Hospital, where he was diagnosed with paranoid schizophrenia. H.J. was doing well right after his release from Richmond State, but he soon deteriorated after he refused to take prescribed antipsychotic medicines. He became paranoid, could not sleep, and lost his job in December 2022 due to conflicts with coworkers.

[9] According to H.J.'s mother, H.J.'s physical condition continued to deteriorate, and his verbal abuse escalated. He had recently been living in his car because he was evicted from an apartment for altercations with his neighbors. Days before the commitment hearing, H.J. had suggested his toothbrush was poisoned and insisted that he observe the cooking of his food, apparently due to concerns about poisoning.

[10] H.J. testified at the hearing and reported that he had three pending job offers from temporary employment services in three states and that he had been living in hotels recently when he was not staying with his mother. He claimed college degrees that his mother said he lacked. He also reported having enough money to last through the end of the month as a result of his working at various, unspecified jobs. H.J. repeated concerns about threats against his life, indicating that four men, including one with a machete, had threatened to kill him.

[11] The trial court ordered H.J.'s temporary commitment, finding Eskenazi had proven by clear and convincing evidence that:

1. [H.J.] is suffering from unspecified psychotic disorder . . . which is a mental illness as defined in I.C. 12-7-2-130.

2. [H.J.] is dangerous to self [and] dangerous to others, as defined in I.C. 12-7-2-53 . . .

3. [H.J.] is in need of custody, care and treatment at [Eskenazi] or a state operated facility, for a period of time not expected to exceed ninety (90) days . . . .

App. Vol. II, p. 10.

The trial court further ordered H.J. to abide by the following special conditions upon attaining outpatient status:

- "take all medications as prescribed."

- "attend all clinic sessions as scheduled."

- "maintain his address and phone number with the Court and designated facility."

- "not harass or assault family members or others."

*Id*. at 11.

## Discussion and Decision

On appeal, H.J. alleges a due process violation amounting to fundamental error arising from the lack of closing arguments at his temporary commitment hearing. He also contends the trial court erred in ordering him to take all medications as prescribed upon achieving outpatient status. Although his commitment has expired, H.J. claims the appeal is not moot. Alternatively, H.J. invites this Court to address his claims under the public interest exception to the mootness doctrine. We conclude this exception applies to H.J.'s due process issue only and therefore review this claim. We affirm, finding H.J. has failed to establish a violation of due process amounting to fundamental error.

## I. Mootness

The long-standing rule in Indiana is that a moot appeal will be dismissed because the opinion is merely advisory if effective relief cannot be granted. *C.P.*

*v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 219 N.E.3d 142, 146 (Ind. Ct. App. 2023). "A case is moot when the controversy at issue has been ended, settled, or otherwise disposed of so that the court can give the parties no effective relief." *E.F. v. St. Vincent Hosp. & Health Care Ctr., Inc.,* 188 N.E.3d 464, 467-68 (Ind. 2022)*.*

[15] In an appeal from an expired temporary commitment, we "thoughtfully and thoroughly consider whether the case is moot and whether the public-interest exception to mootness should apply." *E.F.*, 188 N.E.3d at 467. The public interest "may be invoked when the issue involves a question of great public importance which is likely to recur." *Id.* at 466 (quoting *Matter of Tina T.*, 579 N.E.2d 48, 54 (Ind. 1991)).

[16] H.J. argues that the public interest exception to the mootness doctrine applies. The question of whether civil commitment respondents have a due process right to present closing arguments is a question of great public importance likely to recur, according to H.J. We agree and therefore review H.J.'s due process claim under the great public interest exception.

## II.  Due Process

[17] An involuntary civil commitment is a significant deprivation of liberty. *In re Commitment of T.K.*, 27 N.E.3d 271, 273 (Ind. 2015). Respondents in these proceedings therefore are entitled to due process protections, including an opportunity to be heard. *A.A. v. Eskenazi Health/Midtown CMHC*, 97 N.E.3d

606, 611 (Ind. 2018). These due process rights have been codified in Indiana Code § 12-26-2-2(b), which states:

> The individual alleged to have a mental illness has the following rights:
>
> (1) To receive adequate notice of a hearing so that the individual or the individual's attorney can prepare for the hearing.
>
> (2) To receive a copy of a petition or an order relating to the individual.
>
> (3) To be present at a hearing relating to the individual. The individual's right under this subdivision is subject to the court's right to do the following:
>
>> (A) Remove the individual if the individual is disruptive to the proceedings.
>>
>> (B) Waive the individual's presence at a hearing if the individual's presence would be injurious to the individual's mental health or well-being.
>
> (4) To be represented by counsel.

[18] H.J. claims a due process violation from the trial court's entry of judgment right after the close of evidence without allowing closing argument from his counsel. The Indiana appellate courts have not addressed whether respondents in involuntary commitment proceedings are entitled to present closing arguments as a derivative of their due process right to counsel. But as criminal defendants enjoy such a right, H.J. asks this Court to recognize the same rule here. H.J. notes that both criminal defendants and respondents in commitment proceedings face a significant loss of personal liberty, and the due process rights

accorded each overlap to some extent. But the right to closing arguments in criminal cases arises from the Sixth Amendment, which by its express terms does not apply in civil commitment proceedings. *Herring v. New York*, 422 U.S. 853, 857-63 (1975); U.S. Const. amend VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial . . . and to have the assistance of counsel for his defense . . .").

[19] H.J. did not request closing argument and did not object to its omission until this appeal. H.J. claims he had no opportunity to object and, therefore, did not waive any claim of error under Indiana Trial Rule 46. This rule provides that "if a party has no opportunity to object to a ruling or order at the time it is made, the absence of an objection does not thereafter prejudice him." T.R. 46. But the record does not support H.J.'s claim that he had no opportunity to object. He could have objected once the trial court stated it would enter judgment.

[20] Alternatively, H.J. attempts to avoid waiver by raising this due process claim as fundamental error. "Fundamental error is error which is a blatant violation of our concepts of fundamental fairness and in which the harm is substantial and apparent." *A.L. v. Wishard Health Servs., Midtown CMHC*, 934 N.E.2d 755, 758 (Ind. Ct. App. 2019). To be deemed fundamental, an error must be "so likely to have infected the verdict or judgment that confidence in the correctness of the trial result has been undermined." *In re Commitment of Gerke*, 696 N.E.2d 416, 421 (Ind. Ct. App. 1998).

[21] Even if the omission of closing arguments was erroneous, H.J. has failed to establish that the fundamental error standard was met. The evidence supporting H.J.'s commitment was overwhelming. The record shows that H.J. had been hospitalized twice before for his mental illness, once for six months only a few years ago. Once he stopped taking his medications after his release from this lengthy hospitalization, H.J. deteriorated physically and mentally. He lost his job, was evicted for altercations with neighbors, began living in his car at least part of the time, and survived on ramen noodles. He would not respond to family members' telephone calls and viewed his mother and brother as "imposters." Tr. Vol. II, p. 8.

[22] Most disturbingly, H.J. threatened his younger brother with a knife while his brother was holding an infant. H.J. imagined his brother was holding weapons, including brass knuckles, when the evidence otherwise showed his brother was unarmed. Before and after his most recent hospitalization, H.J. displayed disorganized and paranoid thoughts and refused to accept medication for his mental illness.

[23] At the commitment hearing, H.J.'s responses to the court's questioning similarly reflected confusion. When the court asked him to clarify whether he was asking for temporary access to a computer or cell phone to pay personal bills, H.J. responded:

> Yes, and also a different location to be transferred to because of my fingernails. I would like to actually trim those or clip those

because of just actual (sic) being a male. I would have to say for some type of stigma.

Tr. Vol. II, p. 60. When asked by a hospital worker whether he had been living out of his car recently, H.J. responded, "I do need storage unit, space, yes ma'am." *Id.*

[24] Given this overwhelming evidence supporting H.J.'s temporary involuntary commitment, we conclude that even if H.J. had presented closing argument, it would not have changed the result. No fundamental error occurred.

[25] Therefore, we leave for another day whether the right to due process accorded involuntary commitment respondents includes a right to closing argument. Meanwhile, trial courts in commitment proceedings are well advised to allow the parties the opportunity to present closing arguments. As in criminal cases, closing arguments may serve several purposes, including "clarif[ying] and sharpen[ing] the issues." *Nickels v. State*, 81 N.E.3d 1092, 1096 (Ind. Ct. App. 2017) (reversing criminal conviction based on defendant's lack of opportunity to present closing argument). Closing arguments also "give[] the defense one last chance to persuade the trier of fact" and "aid[] the judge's decision-making by providing opposing viewpoints." *Id.* Whether or not closing arguments are constitutionally required, they enhance the trial court's ability to render a fair and just judgment.

## III. Special Conditions of Commitment

[26] H.J.'s final claim is that the trial court abused its discretion in ordering him to take all medications as prescribed once he achieved outpatient status. As this order has expired and H.J.'s medication claims are specific to his individual case, we do not find the public interest exception applies to this issue. *See E.F.*, 188 N.E.3d at 467 (ruling that when an appellate court elects to address an issue under the public interest exception, it need not address all the issues in the case). We therefore do not address this claim.

[27] We affirm the trial court's judgment.

Vaidik, J., and Foley, J., concur.

ATTORNEY FOR APPELLANT

Sarah Medlin
Marion County Public Defender Agency
Indianapolis, Indiana

ATTORNEY FOR APPELLEE

Bryan H. Babb
Seema R. Shah
Bose McKinney & Evans LLP
Indianapolis, Indiana